## Calder's Estate.

Argued May 27, 1941. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*James H. Booser* and *Maurice R. Metzger,* with them *McNees, Hollinger & Nurick,* for appellants.

*Lewis S. Kunkel,* with him *William H. Neely,* for appellee.

OPINION BY MR. JUSTICE PARKER, September 29, 1941:
The question presented on this appeal arose on the distribution of a portion of the estate of Martha Alice Hess Calder, who died testate July 19, 1926, and involves

a construction of her will. The ultimate question is whether a nephew, Russell Hess Lindsay, is entitled to the fund for distribution absolutely or is entitled to a life estate only. An auditor and the orphans' court awarded the fund to Russell absolutely.

The testatrix, after certain bequests not of importance here, directed her estate to be divided into two equal shares. The one share was disposed of in compliance with the wishes of her husband who had predeceased her and the other share was treated as her separate estate. This controversy arises out of the disposition of the second half of her estate which was intended primarily to benefit those of her own blood. The fund, onefourth of the second half, is that portion of the estate, the income from which was paid for life to a sister, C(K)atherine Hess McKenzie, who died April 10, 1935.

The second half of her estate, after bequests to her church, was disposed of in the following language:* "[1] Balance to be divided in equal shares to my sisters Fannie, Carrie, Catherine and my nephew Russell Lindsay after two thousand dollars in cash is paid over to my half sister Linnie A. Hess. [2] At the death of any of my sisters their share shall go to Russell Lindsay or in case of his death and he leaves no children his portion shall go to my sisters Fannie, Carrie and Catherine. [3] At the death of my sister Carrie, her share goes to her son but out of that share, one thousand dollars must be paid over to her husband Alex. M. Lindsay if he survives. [4] At the death of my sister Katherine, her share shall go to my nephew Russell Lindsay but out of that share one thousand dollars must be paid to her husband Doctor Horace W. McKenzie if he survives. [5] This second half of the estate, outside of the bequests I have made, I wish to descend to my nephew Russell Lindsay and his children. [6] Should he leave no issue, then it

* We have inserted the numbers in brackets, following a suggestion of counsel for the appellant, for convenience in referring to the different sentences.

shall go to the Churches of God College at Findlay, Ohio one-half and the other half to the Churches of God Home Missions and shall be known as the 'Alice Hess Calder Funds'. [7] In case of death of any of the herein mentioned heirs, if they leave no children, their share shall revert to the estate and divided among the survivors."

She named her nephew, Russell, and a trust company as her executors but did not name a trustee. The three surviving sisters and the nephew all acquiesced in construing clause [1] as giving the three sisters, Fannie, Carrie, and Catherine, a life estate only. On petition the orphans' court originally appointed the corporate executor as trustee but it has now been succeeded by the Dauphin Deposit Trust Company which made the accounting which gave rise to this controversy. Catherine died on April 10, 1935, having received during her lifetime the income on one-fourth of the second half of the estate. The account here involved has to do only with this portion of the estate.

The appellants are Findlay College, General Eldership of the Churches of God in North America, and Maurice R. Metzger, guardian ad litem for Daniel Russell Lindsay, a minor son of Russell Hess Lindsay born February 1, 1939, and for unborn persons interested. It is the theory of the court below and the appellee that Russell took an absolute estate on the death of his aunt, Catherine, in her share, which bequest was not reduced by subsequent sentences and phrases in the will. They depend upon the well settled principle of law that where words sufficient to vest an absolute estate are used in a will, such interest is not to be cut down by subsequent provisions, unless the testator has indicated a clear intent to take away the estate previously given: *Cross v. Miller,* 290 Pa. 213, 216, 138 A. 822; *Lerch's Estate,* 309 Pa. 23, 159 A. 868. They further treated clauses [5], [6], and [7] as constituting substitutionary gifts which were to be effective only if Russell predeceased testatrix or died without children before the termination of any

of the life estates, citing §14 of the Wills Act of June 7, 1917, P. L. 403 (20 PS §226), and the rule stated in *Seewald's Estate,* 281 Pa. 483, 486, 127 A. 63, where we said that "where an absolute estate is devised, followed by a gift over in event of the death of the donee without issue, such words will be construed as referring to death without issue in the lifetime of testator if the gift is immediate, or during continuance of the life estate if the gift is not immediate, and if the donee survives testator or the continuance of the intervening estate, his interest becomes absolute."

The appellants reply that the first gift to Russell of the interest of Catherine at her death is ambiguous and that the gifts over are so clear that in any event Russell's interest is limited to a life estate, particularly by gifts over to surviving sisters, by gifts over in the event of his death without issue, and by gifts over to testatrix's church college and missions. It therefore appears that the controversy turns upon the quality of the estate originally given to Russell and the clarity of the subsequent provisions.

This is a layman's will written by a layman, and we ought to so construe it: *Lippincott's Estate,* 276 Pa. 283, 287, 120 A. 136. The intent of the testator as disclosed therein has always been held controlling in construing a will; the courts will seek to find that intent within its four corners: *Mereto's Estate,* 311 Pa. 374, 377, 166 A. 893. It is a fundamental rule applied in the construction of wills that the intent of the testator shall be determined from an examination of the very words of the will taken as a part of an entire work and in the light of the circumstances under which it was written. In gathering the meaning of words and phrases and the sense in which they are used, the context and the will as a whole must be taken into account: *Smith's Petition,* 291 Pa. 129, 134, 139 A. 832. Considering the circumstances, we find that the testatrix, in disposing of the second half of the residue, was providing for those of

her own blood. Her blood relations consisted of three sisters and a nephew, a son of one of those sisters. She assumed that her sisters would not have any more children and that that branch of her family would be continued only by the marriage of the nephew and the birth of a child or children to him.

Reading the will as a whole, we find a dominant intent that her estate should be used to care for the sisters for their lifetimes, with small bequests for the surviving spouses of two of the sisters, and that it should then pass to Russell and his children. She took into account the possibility that Russell might not marry and have children and in that event she desired the residue to go to certain of her church interests. While she provided for other contingencies, the dominant and conspicuous features of the will to which we have referred cannot be disregarded or ignored. A more particular examination of the various clauses of the will in the light of well settled rules of construction will confirm that general conclusion.

By clause [1] testatrix directed the balance, the half of a residue, "to be divided in equal shares to my [her]. sisters . . . and my [her] nephew." All the parties in interest conceded, and we think properly so, that each of these parties by this clause took a life estate only in one-fourth of one-half of the residue. If such were not the case the remaining clauses [2] to [7] would be meaningless. "It is a well recognized rule of construction that a limitation over after the death of the first devisee is evidence of an intention that the devisee of the prior estate in order of enjoyment was intended to have not more than a life estate": *Boulevard from Second St.,* 230 Pa. 491, 494, 79 A. 716, and see cases cited in footnote 5 of *Byrne's Estate,* 320 Pa. 513, 518, 181 A. 500. The expressions "at the death of any of my sisters" and "at the death of my sister Katherine" are not equivalent to an expression "in the case of my sister's death". Consequently, the limitation over "at the death of any of my

sisters" refers to death at any time. Nothing is more certain than death and nothing more uncertain than the time of it. The word "at" being used to refer to an event certain to happen must be taken to refer to that event whenever it shall happen: *Pinkerton's Estate,* 193 Pa. 275, 44 A. 424. Also, see *Horton v. Upham,* 72 Conn. 29, 43 A. 492; *Watts v. Finley,* 187 Ga. 629, 1 S. E. (2d) 723.

"At the death of any of my sisters their share shall go to Russell Lindsay" [2], and "at the death of my sister Katherine, her share shall go to my nephew Russell Lindsay" [4] are the clauses that first deal with the interest which Russell was to take on the death of Catherine. What did testatrix mean by her words when she said that Catherine's *share* shall go to Russell Lindsay? In clause [1] she had directed her estate to be divided into "equal shares to my sisters . . . and my nephew Russell Lindsay." It was the principal that was to be divided into *shares,* but it is conceded that a sister was only to take the income from a share so that the share of a sister was a life interest and it was Catherine's share which was given to Russell. It is reasonable to infer that testatrix, in giving Russell another *share,* intended to give him an estate of the same quality as the *share* given in the first sentence. We cannot, however, avoid the conclusion that some ambiguity arises by reason of using "share" to designate share of principal one moment and using it to denote share of income the next instant. If the testatrix, in fixing the quality or quantity of the estate which Russell was to take at the death of Catherine in the share from which the income was to be paid to her for life, had stopped with clauses [2] and [4], there would probably be little difficulty in coming to the conclusion that Russell was to take the principal at that time. But the testatrix said much more, and we are not permitted to ignore any portion of her words if they can be given a reasonable meaning, particularly so when the prior expression is ambiguous. The subsequent clauses are in clarification of what has gone before rather than

repugnant to it. When we seek to give the subsequent clauses some meaning, as we should do, it becomes even more apparent that the will must be read as a whole and, in our opinion, that the interest given Russell was but a life interest.

Turning to clauses [5], [6], and [7] and placing ourselves in the position of the testatrix, we find her endeavoring to clear up the ambiguity to which we have referred. In language that is clear and whose legal meaning is fixed, she provided that the second half of her estate, aside from specific bequests, should descend to Russell "and his children" but that if he should not leave issue the second half should then go to certain church interests.

Clause [5] gave Russell a life estate and gave the principal at his death to his children: *Coursey v. Davis,* 46 Pa. 25; *Crawford v. Forest Oil Co.,* 208 Pa. 5, 57 A. 47; *Chambers v. Union Trust Co.,* 235 Pa. 610, 84 A. 512. Although the word "wish" is generally precatory, it may be mandatory "when expressive of the intent of the testator to be carried out without the intervention of another's will": *Croft v. Chelten Trust Co.,* 272 Pa. 514, 517, 116 A. 479. Where such words are used "in direct reference to the estate, they are prima facie testamentary and imperative, and not precatory": *Presbyterian Board of Foreign Missions v. Culp,* 151 Pa. 467, 470, 25 A. 117. Also, see *Fox's Appeal,* 99 Pa. 382, 386; *Stinson's Estate (No. 1),* 232 Pa. 218, 221, 81 A. 207. Clause [6] immediately follows and uses language that is clearly mandatory. It would be illogical to hold clause [5] precatory and clause [6] mandatory.

As we construe the will, Russell acquires successively the various life estates if he survives the other life tenants but does not take the principal. If he leaves a child to survive him, such child takes the principal at his death. If he does not leave issue, the principal goes to the church activities mentioned in the will. This construction "will render every word operative rather than

one which makes some words [and sentences] idle and nugatory": *Byrne's Estate,* 320 Pa. 513, 519, 181 A. 500; but much more important, it makes the whole will harmonious and accomplishes the primary intent of the testatrix.

We do not question the principle relied upon by the appellee that where there is an absolute gift of a thing later words in the same instruments will not operate to reduce the estate thus given, unless it is reasonably certain that such was the intention of the donor (*Lerch's Estate,* 309 Pa. 23, 27, 159 A. 868). In *Lerch's Estate* and kindred cases the prior gifts were definite* and the subsequent language indicated merely a subordinate intent. Here the testatrix used ambiguous language in giving the prior estate, which language she subsequently interpreted. The language which follows is not repugnant to but explanatory of what has gone before. The will as a whole shows a dominant intent to give Russell a life estate only and the subsequent gifts over are clear and reasonably certain.

Neither is any support given to the theory of the appellee by resorting to that phase of the last mentioned rule that where an absolute estate is devised, followed by a gift over in the event of the death of the donee without issue, such words will be construed as setting up a substitutionary gift in event of death of the donee without issue in the lifetime of the testator if the gift is immediate, or during the continuance of the life estate if the gift is not immediate. In the first place, as we have construed the will, Russell was not given an absolute estate. In the second place, the gift over by clause [5] of the

---

* The words held to give an absolute estate were, in *Lerch's Est.,* supra (p. 26), "he to have and to hold the same absolute and forever"; in *Robinson's Est.,* 282 Pa. 531, 532, 128 A. 437, "all of my estate . . . absolutely and in fee simple"; in *Billmyer v. Billmyer,* 296 Pa. 31, 33, 145 A. 674, "unto my beloved wife . . . her heirs and assigns forever"; and in *Cross v. Miller,* supra (p. 215), "I bequeath to the following nieces the remainder of my estate to share and share alike".

will is of the second half of the estate, or all four shares. If the nephew had predeceased Katherine or testatrix, the ultimate legatee could not have been substituted in his place. The ultimate legatee would not have a right to the second half of the estate until the death of all three sisters. A gift over of four shares cannot be substitutionary for a gift of one share. The testatrix contemplated that in the natural course of events her nephew would survive her sisters. The contingency that Russell should not be the last survivor was attempted to be met by clauses [2] and [7] rather than by clause [6]. In view of our conclusion and taking into account the consequent change in life tenants, it may be necessary to proceed under §23 of the Act of June 7, 1917, P. L. 447 (20 PS §635), in order to protect the fund. The record does not inform us fully as to the powers of the Dauphin Deposit Trust Company.

The decree of the court below is reversed, and the record is remitted to that court that distribution may be made in accordance with this opinion. The costs of this appeal shall be paid from the principal for distribution.