Pearson Estate.

Argued November 19, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN and POMEROY, JJ.

176

*William H. Wood,* with him *Metzger, Hafer, Keefer, Thomas and Wood,* for appellant, income beneficiary.

*Bruce E. Cooper,* with him *Charles E. Friedman,* and *Cooper, Friedman & Friedman,* for appellant, guardian and trustee ad litem.

*Charles A. Woods, Jr.,* Deputy Attorney General, with him *Fred Speaker,* Attorney General, for Commonwealth, appellant.

*R. J. Woodside,* with him *Woodside, Woodside & Zwally,* for appellant, North Dakota State University, remainderman.

*Walter K. Swartzkopf, Jr.,* with him *Paul H. Rhoads,* and *Rhoads, Sinon & Reader,* for appellee, administrator c.t.a.

*James H. Stewart, Jr.,* with him *Nauman, Smith, Shissler & Hall,* for appellees, income beneficiaries.

OPINION BY MR. JUSTICE JONES, March 18, 1971:

Robert Pearson (testator) died on July 27, 1967, leaving a holographic instrument dated January 7, 1958, and entitled "Will and Testimony" (will), which was admitted to probate and letters of administration c.t.a. were granted to Dauphin Deposit Trust Company (administrator).[1] Testator, a childless widower, was survived by six brothers and sisters, thirteen nephews and nieces and twenty-nine grandnephews and grandnieces.

The controversial portions of the will prompting these appeals are:

"[2] It is the hope and prayer, that my estate, or the proceeds of my estate, be placed in trust for the benefit of the legal heirs, entitled to succeed to my estate.

"[3] It is the further instruction that the proceeds of my estate be placed in a Trust Fund, under the management of a reliable Agency or Banking Firm, and administered throughout the life and period of the Estate, as long as there are living legal heirs. The heirs or beneficiary to share the income from the Trust Fund.

"[4] The rate or partition shall be apportioned according to the number of living nephews and neices [sic], and thereafter equally proportioned to the surviving heirs. There shall be an exception provided in the aforestated declaration, in the event of special hardships. The first apportionment of the income from the Trust Fund shall accrue to the benefit of the brothers and sisters, during their life.

. . . .

"[7] When the Trust Fund has fulfilled its obligation to the heirs, and thereby spent its usefulness of

---

[1] Although appellant Clara Leonard, one of testator's sisters, was named "first administratrix" in the will, she renounced her right to receive letters testamentary and Dauphin Deposit Trust Company was appointed administrator c.t.a.

the legal requirements, the estate shall be awarded to benevolent organizations, educational Institutions, and Charities [hereinafter collectively termed 'Charities']."[2]

The administrator filed its first and partial account and a petition for proposed distribution wherein it posed questions to be determined by the auditing judge and its suggested interpretation of testator's intent.[3] Thereafter, exceptions to the proposed distribution were advanced by the parties to these appeals. In its order, accompanied by an opinion, the court below rendered the following interpretation of testator's will: (1) testator created a valid trust; (2) the income from the trust fund is to be distributed among those of the testator's brothers and sisters who had children surviving at the time of testator's death with each share to be determined according to their respective number of said children;[4] (3) upon the respective deaths of testator's brothers and sisters, their shares of income are to be paid in equal proportion to their children for their lives or to the heirs of any deceased child and

---

[2] In the eighth paragraph, equal portions of this charitable remainder were given to the Agricultural College of North Dakota State University, the Lutheran Church and any Charity perpetuating the memory of testator's wife.

[3] That novel, vexing problems are presented by this appeal is evidenced by a collateral issue raised by a motion to suppress a brief: whether an administrator, not an aggrieved party entitled to appeal but a mere stakeholder, will be permitted to file a brief before this Court. Preliminarily, the standing of the administrator must be questioned since it is not an aggrieved party. *See* Annot., 16 A.L.R. 3d 1274 (1967). Even if standing should be accorded this administrator, the possibilities for breach of its fiduciary duties are countless as the proposed distribution necessarily benefits some beneficiaries to the detriment of others.

For the purposes of these appeals and without establishing a precedent, we have simply treated the administrator's brief as that of an amicus curiae. *See,* Supreme Court Rule 65.

[4] This interpretation causes appellant Clara Leonard to receive no part of the estate since she was childless.

so forth to testator's heirs ad infinitum; and (4) testator intended that, upon the death of his last collateral descendant, the corpus of the trust should be paid to charities. However, applying the Rule Against Perpetuities *at the time of testator's death,* the lower court voided the gifts to descendants after nephews and nieces as well as the gifts to charities and ordered a distribution of the corpus of the trust under the laws of intestate succession upon the death of testator's last surviving nephew or niece. *Pearson Estate,* 48 Pa. D. & C. 2d 607 (O.C. Dauphin, 1968). Various petitions, requests and exceptions were filed by the parties and denied by subsequent orders. These appeals followed.

## Enforceability of the Trust

Initially we must determine whether the testator intended to create a trust, and, specifically, whether the possibly precatory quality of the words "hope and prayer" in paragraph two renders the trust invalid because of the lack of enforceable duties. *See, e.g., Corbett Estate,* 430 Pa. 54, 241 A. 2d 524 (1968). As this Court noted in *Brubaker v. Lauver,* 322 Pa. 461, 464, 185 Atl. 848, 850 (1936): "Precatory words as to the disposition of property will not create a trust. Expressions of a wish, desire or recommendation that the transferee of property should use or dispose of it in a specified manner will not give rise to a trust; to do so, they must have the force or meaning of a command: see 49 A.L.R. 10. The primary question is the intention of the declarant: did he mean to control and govern the conduct of the transferee with respect to the property, or to suggest and recommend the manner in which it should be used or disposed of, leaving its ultimate control and disposition entirely within his discretionary power? *The test is, whether the precatory expression was used in a mandatory sense, though*

*couched in a mild, polite, courteous command, or only as suggestion or wish, falling short of binding and compulsory direction*: [citation omitted]." (Emphasis added) *See, also, Corbett Estate, supra; Calder's Estate,* 343 Pa. 30, 21 A. 2d 907 (1941) ; *Stinson's Estate (No. 1),* 232 Pa. 218, 81 Atl. 207 (1911). An examination of paragraphs three, four and seven reveals an elaborate, albeit confusing, scheme of distribution imposing very definite duties on the trustee and convinces us of the propriety of the conclusion of the court below that a valid trust was *created.*

### Testator's Intent

Advancing to the next inquiry, we are called upon to construe testator's intent.

"The law and the legal principles governing the interpretation of wills is well settled, but their application to poorly or ambiguously drawn wills (especially to holographic wills and lengthy testamentary trusts) is often difficult. The pertinent principles may be thus briefly summarized: A testator's intent, unless unlawful, shall prevail; that intent shall be ascertained from a consideration of (a) all the language contained in his will, and (b) his scheme of distribution, and (c) the circumstances surrounding him at the time he made his will, and (d) the existing facts; and (e) canons of construction will be resorted to only if the language of the will is ambiguous or conflicting or the testator's intent is for any reason uncertain. [Citations omitted]." *Carter Estate,* 435 Pa. 492, 496-97, 257 A. 2d 843, 845 (1969). *Accord, Matthews Estate,* 439 Pa. 69, 264 A. 2d 714 (1970) ; *Derham Estate,* 435 Pa. 590, 258 A. 2d 650 (1969).

Bearing in mind these principles concerning the interpretation of wills, we must first decide whether testator, by placing his estate in trust for the "benefit of

the legal heirs" (paragraph two), intended to bequeath and devise life estates to *only* his brothers and sisters. Such construction is *possible* under Section 14(4) of the Wills Act of 1947, Act of April 24, 1947, P. L. 89, §14(4), 20 P.S. §180.14(4). Under that section, in the absence of a contrary intent, a devise or bequest to "heirs" shall be interpreted to include only those persons who would take under the intestate laws.[5] In the case at bar, only the brothers and sisters could be "heirs" under the Intestate Act of 1947 since *all* testator's brothers and sisters have survived him and they could take to the exclusion of all later descendants. Act of April 24, 1947, P. L. 80, §§3, 4(1), 20 P.S. §§1.3, 1.4(1) (Supp. 1970). However, to apply this statutory rule of interpretation would, in our view, ignore the plain language of paragraph seven which demonstrates an intent to provide for the nephews and nieces as well as their issue. In the light of the language employed and despite Section 14(4), *supra,* we do not believe testator intended to limit participation in the estate to the brothers and sisters alone. *See,* Restatement of Property, §305, comment p at 1683 (1940).

Further construing testator's intent, we must next determine whether testator intended *all* or *some* or *none* of his brothers and sisters to have a life estate in the income produced by the corpus. This jumble of theories is made possible by the nettlesome fourth paragraph wherein testator provided for the apportionment of income "according to the number of living nephews and neices [sic]." From this language the appellees are able to argue that the primary object of testator's bounty was his nieces and nephews with only a secondary interest in their parents' well-being, especially as

---

[5] This provision of the Wills Act is but a codification of prior case law. *See, Farmers Trust Co. v. Wilson,* 361 Pa. 43, 63 A. 2d 14 (1949).

all testator's brothers and sisters were advanced in years. Thus, appellees' argument, accepted by the lower court, is that only those brothers and sisters *with children* are entitled to share and that appellant Clara Leonard is excluded as she is childless.[6] The guardian and trustee ad litem, one of the appellants, makes a more radical interpretation of this language and proposes that *no* brother or sister is entitled to share in the estate while other appellants suggest that *all* brothers and sisters are to share equally.

Because the testator directed in paragraph four that "the *first* apportionment of the income from the Trust Fund shall accrue to the benefit of *the brothers and sisters*," (emphasis added) we deem the position of the guardian to be untenable. However, owing to the troublesome and ambiguous first sentence of paragraph four, any further interpretation of testator's intent can only be accomplished by resort to the canons of construction.

Throughout the will testator referred to his "heirs" or "the brothers and sisters" without ever intimating the exclusion of appellant Clara Leonard. Had this result been intended, a more direct method than this intricate, euphemistic scheme could have been employed. Moreover, this Court has created both a presumption[7] and a canon of construction[8] that an heir is not to be disinherited except by plain words or necessary implication. In this vein we are not persuaded by the initial placative conclusion of the lower court that by the testator's appointment of appellant Clara Leonard as

---

[6] The computation on this theory results in divisions in the first set of life estates of 3/13 (Alma Burman), 4/13 (Eleanor Pearson Ladd), 0 (Clara Leonard), 2/13 (Lillian Simpson), 2/13 (Charles H. L. Pearson) and 2/13 (Bernard H. Pearson).

[7] See, e.g., *Farrington Will*, 422 Pa. 164, 220 A. 2d 790 (1966).

[8] See, e.g., *McGuigen Estate*, 388 Pa. 475, 131 A. 2d 124 (1957), and cases cited therein.

"first administratrix"[9] he essentially "include[d] her in his will . . . by entitling her to fees and commissions directly from the estate." To accept this reasoning would ignore the basic concept that the commission payable to a personal representative is purely a *fee for services performed* and does not constitute a legacy in any sense of the word—the amount of the commission must be commensurate with the services actually performed by the personal representative. *See, e.g., Thompson Estate,* 426 Pa. 270, 232 A. 2d 625 (1967) ; *Wallis Estate,* 421 Pa. 104, 218 A. 2d 732 (1966). We are convinced that testator did not intend to disinherit his sister, Clara Leonard, and did not intend that she be the recipient of his bounty only by receiving a commission as a personal representative.

Further, it is our belief that testator's intent becomes most evident by the simple expedient of transposing a sentence. This principle of construction was most recently recognized in *Farrington Will,* 422 Pa. 164, 167, 220 A. 2d 790, 792 (1966) : "This is not a case in which the transposition of a sentence or the addition of punctuation in any way supplies an intent on the part of decedent not otherwise apparent. Cf. Conner's Estate, 346 Pa. 271, 29 A. 2d 514 (1943). The court below merely employed the technique, long utilized by the courts of this Commonwealth when faced with a document which clearly albeit ungrammatically, expresses the intent of a testator, of transposing a sentence in order to effectuate the testamentary purpose. See Biles v. Biles, 281 Pa. 565, 127 Atl. 235 (1924) ; Worst v. DeHaven, 262 Pa. 39, 104 Atl. 802 (1918). It

---

[9] Paragraph five of the will, not otherwise relevant, provides: "[5] One administrator or administratrix shall be designated by the group of heirs, to represent the heirs, and serve jointly with the administrator of the Trust Fund. The first administratrix shall be Mrs. Richard C. Leonard (Clara Theresa Pearson)."

is not rules of grammar which are significant, but rather the intent of the testator, and the order of words is immaterial if a different arrangement will best express that intent. Biles v. Biles, supra; Worst v. De-Haven, supra." In our view, a more accurate exposition of testator's scheme is achieved if the last sentence of paragraph four is placed first,[10] which would make the fourth paragraph read as follows: "The first apportionment of the income from the Trust Fund shall accrue to the benefit of the brothers and sisters, during their life. The rate or partition shall [then] be apportioned according to the number of living nephews and nieces, and thereafter equally proportioned to the surviving heirs. There shall be an exception provided in the aforesaid declaration, in the event of special hardships."

This rearrangement accords with our previous interpretation of testator's intent to be that *all* the brothers and sisters should share equally, or per capita, in the first life estates of income and that testator's "partition" language indicates an intent that the nieces and nephews, the recipients of the second life estates, should also share per capita as representatives of their parents. However, as testator has directed that income "shall accrue to the benefit of the brothers and sisters, during their life," we believe that *no* nephew or niece will take until the death of *the last surviving brother or sister* and not immediately upon the death of his or her parent. Lastly, we conclude from testator's lan-

---

[10] For purposes of clarification, the original fourth paragraph reads as follows: "[4] The rate or partition shall be apportioned according to the number of living nephews and neices [sic], and thereafter equally proportioned to the surviving heirs. There shall be an exception provided in the aforestated declaration, in the event of special hardships. The first apportionment of the income from the Trust Fund shall accrue to the benefit of the brothers and sisters during their life."

guage in paragraphs three ("Trust Fund . . . [to be] administered throughout the life and period of the Estate") and four ("thereafter *equally* proportioned to the surviving heirs") that testator intended class gifts of successive life estates, per capita, to his collateral descendants *ad infinitum*.[11] Thereafter, and only then, a gift over of the remainder was intended for the charities.

## Legality of Testator's Intent

At this stage we are squarely confronted, for the first time, with the controversial "wait and see" version of the Rule Against Perpetuities.[12] So much has been already written on the history and development of this subject that any further discussion would be unduly repetitious.[13] Nonetheless, the statute cannot be

---

[11] We cannot accept the contention advanced by the Commonwealth that the testator, by evidencing an intent to give to charity, did not want to postpone vesting indefinitely and that, therefore, testator did not intend to provide for his nephews and nieces and/or their issue. Besides ignoring one of the few unambiguous provisions of the will, this interpretation, in our opinion, would rewrite rather than construe decedent's will.

[12] In previous opinions, the "wait and see" legislation was inapposite as (a) the instrument took effect before January 1, 1948, *see, e.g., Taylor Estate*, 384 Pa. 550, 121 A. 2d 119 (1956), and *Harrah Estate*, 364 Pa. 451, 72 A. 2d 587 (1950) ; or (b) a contractual provision was involved, *S. E. Pa. Trans. Auth. v. Phila. Trans. Co.*, 426 Pa. 377, 233 A. 2d 15 (1967), *cert. denied*, 390 U.S. 1011 (1968) ; or (c) as it involved an interest expressly made exempt by statute, *see, e.g., Dreisbach Estate*, 384 Pa. 535, 121 A. 2d 74 (1956) (cemetery trust). Since this will took effect on July 27, 1967, the date of testator's death, the "wait and see" statute is applicable. Estates Act of 1947, Act of April 24, 1947, P. L. 100, §21, 20 P.S. §301.21.

[13] *See,* Bregy, *Intestate, Wills and Estates Acts of 1947,* §§4, 5 (1949) ; Bregy, *A Defense of Pennsylvania's Statute on Perpetuities,* 23 Temp. L. Q. 313 (1950) ; Leach, *Perpetuities Legislation: Hail, Pennsylvania,* 108 U. Pa. L. Rev. 1124 (1960).

understood and applied without reference to the classic statement of the common law Rule Against Perpetuities as set forth in Gray, *The Rule Against Perpetuities,* §201 (4th ed. 1942) (hereinafter "Gray") : "No interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest."[14]  The relevant portions of the statute provide: "Rule against perpetuities (a) General.  No interest shall be void as a perpetuity except as herein provided.  (b) Void interests—exceptions.  Upon the expiration of the period allowed by the common law rule against perpetuities as measured by actual rather than possible events any interest not then vested and any interest in members of a class the membership of which is then subject to increase shall be void.  This subsection shall not apply to: (1) Interest exempt at common law.  Interests which would not have been subject to the common law rule against perpetuities."  Estates Act of 1947, Act of April 24, 1947, P. L. 100, §4, 20 P.S. §301.4.  As succinctly stated in the Commission's comments, to which we may refer, *Martin Estate,* 365 Pa. 280, 74 A. 2d 120 (1950) : "This subsection is intended to disturb the common law rule as little as possible, but to make actualities at the end of the period, rather than possibilities as of the creation of the interest, govern and to provide a more equitable disposition of void gifts."[15]

---

[14] To this statement may also be added periods of gestation. Gray, §§220-22; Bregy, *Intestate, Wills and Estates Acts of 1947,* §4 at 5272 (1949).  In this manner, one grandnephew, born after testator's death but conceived before his death, may be considered a life in being.  For purposes of brevity and simplicity, we will not refer in the text to this period of gestation although it is encompassed in the full statement of the Rule Against Perpetuities.

[15] The Commission further noted: "By regarding actualities at the end of the period, the unrealistic results based on purely theoretical possibilities are avoided.  The possibility test seems pecu-

The court below, in derogation of both *Quigley's Estate,* 329 Pa. 281, 198 Atl. 85 (1938), and the "wait and see" statute, proceeded to a determination of the legality of all the future interests *upon testator's death.* The lower court's rationale was the necessity to pass on the eligibility of the charities to take under the will since the extent of their taking will affect the tax liability of the estate. It may be true that cases such as *Carter Estate,* 435 Pa. 492, 257 A. 2d 843 (1969), exemplify this Court's recognition of the necessity, occasioned by the federal estate and state inheritance tax laws, for a prompt determination of questions concerning future interests; however, owing to the ever-increasing extent of estate tax liability,[16] to recognize this principle in this context would emasculate the "wait and see" rule. We cannot adopt the rationale of the court below in this respect.

In our analysis we deem it best to first consider the legality of the most remote interest—the remainder over to the charities. Both at common law, *Philadelphia v. Girard's Heirs,* 45 Pa. 9, 26 (1863), and by later legislation, Act of May 9, 1889, P. L. 173,[17] it was provided that a charitable gift can be given in perpetuity. Accordingly, it is sometimes said to be the general rule

---

liarly inappropriate in most Pennsylvania cases because by the time the courts do decide upon the validity of the remainders, possibilities have become actualities. This results because (1) the modern tendency is to uphold valid life estates even though the ultimate remainder seems obviously void, and (2) the court refuses to decide on the validity of future estates until the termination of the valid life estates. See Quigley's Est., 198 A. 85, 329 Pa. 281, on both points."

[16] Particularly apropos is the famous aphorism attributed to Benjamin Franklin that nothing is as certain as death and taxes.

[17] This Act was repealed by the Estates Act of 1947, Act of April 24, 1947, P. L. 100, §20, 20 P.S. §301.20, but is now incorporated in 20 P.S. §301.4(b)(1). *See* Commission's comment to subsection (b)(1).

188

that a charitable bequest or devise is not subject to the Rule Against Perpetuities. *See, Scholler Trust,* 403 Pa. 97, 105, 169 A. 2d 554, 558 (1961); Gray, §589. Thus, it would appear, at first glance, that the remainder to the charities is not subject to the "wait and see" rule since Section 4(b)(1) of the statute exempts all those interests not subject to the common law Rule Against Perpetuities. However, it was also settled at common law that if a remainder over to charity constituted a contingent interest and followed an interest violative of the Rule Against Perpetuities, the charitable bequest or devise was illegal. Compare *Ledwith v. Hurst,* 284 Pa. 94, 130 Atl. 315 (1925), and *Penrose's Estate,* 257 Pa. 231, 101 Atl. 319 (1917), with *Gageby's Estate,* 293 Pa. 109, 141 Atl. 842 (1928). *See, also,* Bregy, *Intestate, Wills and Estates Acts of 1947,* §4(b) (1) at 5304 (1949); Gray, §594; Simes, *Future Interests,* 279 (1951); Najarian, *Charitable Giving and the Rule Against Perpetuities,* 70 Dick. L. Rev. 455, 465 (1966).[18] The remainder over to charity may or may not be valid depending upon (1) whether the interest is contingent; and (2) even if contingent, whether any of the preceding interests run afoul of the Rule Against Perpetuities. In accordance with both *Quigley's Estate* and the "wait and see" rule, we will not now determine the validity of the interest to charity. In the same manner, we will discuss, but not determine, the legality of the preceding estates.

[18] Our textual discussion is not meant to disturb the equally well-established principle that a gift over taking effect upon a remote contingency from one charity, not subject to the Rule Against Perpetuities, to another charity does not run afoul of the Rule Against Perpetuities. *See Levan's Estate,* 314 Pa. 274, 171 Atl. 617 (1934); *Lennig's Estate,* 154 Pa. 209, 25 Atl. 1049 (1893); *Lehigh University v. Hower,* 159 Pa. Superior Ct. 84, 46 A. 2d 516 (1946); *Restatement* of Property, §397(1) (1944).

The first complicating factor is the existence of successive class gifts in this appeal. At common law it was said: "Where the gift is to a class, the class must be such that all the members of it must necessarily be ascertained and take absolutely vested interests within the period. If the gift is to a class and it is void as to any one of the class, it is void as to all: [Citations omitted]." *Lockhart's Estate*, 306 Pa. 394, 401, 159 Atl. 874, 876 (1932). Specifically, we are confronted with "gifts to a class, the membership of which is still subject to increase at the expiration of the period," Commission's comments to subsection (b), which is explicitly covered by Section 4(b) of the statute: "any interest in members of a class the membership of which is then subject to increase shall be void." Accordingly, "[u]nder the statute, the class must actually close within the period, even though it might not have." Bregy, *Intestate, Wills and Estates Acts of 1947,* §4(a) and (b) at 5278 (1949).

Although its underlying premise is incorrect, the opinion of the court below, effectively mirroring the common law's emphasis on possibilities at the beginning of the period rather than actualities at the end of the period, provides us with an opportunity to contrast the common law and statutory Rule Against Perpetuities. As correctly noted by the lower court, the respective interests devised and bequeathed to testator's brothers and sisters and nephews and nieces must necessarily vest within the period provided by the Rule Against Perpetuities and are valid: (1) the brothers and sisters because the previous death of testator's parents ensures that testator can have no other brothers and sisters; and (2) the nephews and nieces because no other nephews and nieces can be born after the death of the last surviving brother or sister, and the interest of the nephews and nieces must vest, if not immediate-

ly, within the period enunciated by the Rule Against Perpetuities. The thought implicit in this rationale is that only the brothers and sisters could qualify as measuring lives since the prior demise of their parents precludes the possibility of a "fertile octogenarian" adding yet another member to the class of brothers and sisters. Leach, *Perpetuities in a Nutshell*, 51 Harv. L. Rev. 638, 643-44 (1938) ; see, *Jee v. Audley*, 1 Cox 324, 29 Eng. Rep. 1186 (1787). However, under the common law rule, the nephews and nieces could not be measuring lives since there was a *possibility* of "fertile octogenarian" parents (brothers and sisters) giving birth to an additional nephew and/or niece after testator's death. Thus, any interest to follow the interest of the nephews and nieces, including the remainder over to the charities, if contingent, would fall victim to the Rule Against Perpetuities. It is toward the prevention of such results that the General Assembly enacted the "wait and see" version of the Rule Against Perpetuities. In our view, three possible situations could occur by waiting and seeing.

First, if no additional nephews and nieces are born, not only do the brothers and sisters qualify as measuring lives *but also* the six nephews and nieces. Thus, the interest given to the grandnephews and grandnieces must necessarily vest within twenty-one years following the death of the last surviving nephew or niece since membership in the class of grandnephews and grandnieces could not, thereafter, increase. The gift to the charities, if contingent, however, would be valid only if all the grandnephews and grandnieces should produce no offspring.

Secondly, if no additional nephews and nieces *and* grandnephews and grandnieces are born, not only do the brothers and sisters *and* nieces and nephews qualify as measuring lives *but also* the twenty-nine grand-

nephews and grandnieces. In this situation, the interest to great-grandnephews and great-grandnieces would be valid since that interest must necessarily vest within twenty-one years after the death of the last surviving grandnephew or grandniece. As before, the gift to charities, if contingent, would be invalidated if any of the great-grandnephews or great-grandnieces should produce offspring.

Thirdly, if any of the brothers and sisters should prove to be "fertile octogenarians," then the common law's stress on *possibilities* coincides with the statute's emphasis on *actualities* and our earlier discussion of the opinion of the court below controls.

Since which of the three situations will eventuate is unpredictable, it is necessary that the "wait and see" rule be applied. In failing to do so, the court below fell in error.

## Occurrence of Invalid Interest

Finally, we reach the fourth level of discussion: if any interest be found violative of the Rule Against Perpetuities, what disposition will be made of the corpus? It was the theory of the lower court that the intended distribution of trust income after the extinction of testator's nephews and nieces, along with the gift over in remainder to the charities, violated the Rule Against Perpetuities and that, upon the death of the last surviving nephew or niece, the corpus would pass by intestacy. Again the court below ignored the Estates Act of 1947. Section 5(c) of that Act provides: "Other void interests. Any other void interest shall vest in the person or persons entitled to the income at the expiration of the period described in section 4(b) ('Wait and see')." Act of April 24, 1947, P. L. 100, §5(c), 20 P.S. §301.5(c). Moreover, if the charitable remainder is vested, that interest is valid and Section 5(a) would

then control: "Valid interests following void interests. A valid interest following a void interest in income shall be accelerated to the termination date of the last preceding valid interest." Act of April 24, 1947, P. L. 100, §5(a), 20 P.S. §301.5(a). Since we cannot now determine with certainty what interests do not violate the Rule Against Perpetuities, we cannot determine this issue except to note that the court below's conclusion was erroneous in this respect.

Decree vacated and the matter remanded to the court below with directions to proceed in accordance with the views expressed in this opinion. Estate to pay costs.

Mr. Justice COHEN took no part in the decision of this case.

Mr. Justice ROBERTS took no part in the consideration or decision of this case.