Benson Estate.

Argued April 30, 1971. Before BELL, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

reargument refused January 7, 1972.

*Stephen H. Hutzelman,* Attorney, Tax Division, with him *Meyer Rothwacks, Crombie J. D. Garrett,* Attor-

neys, Tax Division, *Johnnie M. Walters,* Assistant Attorney General, *Barry W. Kerchner,* Assistant United States Attorney, and *Louis C. Bechtle,* United States Attorney, for appellant.

*Cuthbert H. Latta,* with him *M. Paul Smith, Stanley B. Cooper, Smith, Aker, Grossman & Hollinger, Drinker, Biddle & Reath,* and *Waters, Fleer, Cooper & Gallager,* for appellees.

OPINION BY MR. JUSTICE ROBERTS, December 20, 1971:

A controversy concerning the provisions of the deed of trust of Joseph N. Pew, Jr., presents us with the narrow but always perplexing question of whether the trust instrument created vested or contingent interests in each of the settlor's four children if and when they attained the age of thirty-two. We hold the interests vested.

Joseph N. Pew, Jr., created several inter vivos trusts on June 1, 1932, which he funded with 42,000 shares of the common stock of the Sun Oil Company. The settlor, inter alia, directed the trustees to hold 30,000 shares for the benefit of his wife, Alberta H. Pew, during her lifetime.[1] Mrs. Pew was to receive a guaranteed annual income of $30,000, and if the net income from the trust was insufficient, other action was to be undertaken to ensure Mrs. Pew the requisite amount of income.

The remainder interest subject to Mrs. Pew's life estate was described in the trust instrument as follows:

"3. Upon the death of my said wife, Alberta H. Pew, I order and direct said Trustees to divide the said

---

[1] The other 12,000 shares were used to establish four separate trusts for the benefit of each of the settlor's four children. Each trust had a corpus of 3,000 shares.

Thirty thousand (30,000) shares of the Common Stock of said Sun Oil Company, or such other stocks, money or securities which shall be derived from the sale, exchange or investment of any proceeds received from the sale or exchange of said stock, or such other stock or securities, into four equal parts or shares, one such equal part or share to be held for my daughter, Mary Caven Pew [the decedent, Mary Pew Benson], one such equal part or share thereof to be held . . . [for each of the settlor's other three children] under the terms and conditions herein set forth.

"As to the shares or parts herein directed to be held for my daughter, Mary Caven Pew, my son, Joseph Newton Pew, 3rd, my daughter, Alberta Hensel Pew and my daughter, Eleanor Glenn Pew, I order and direct said Trustees to pay over for his, her or their support, maintenance and education any and all cash dividends or interest when and as the same shall be received from their respective shares or parts until each respectively shall attain the age of twenty-four years, and when he or she shall attain the age of twenty-four years to pay over to him or her Twenty percentum (20%) of the principal of his or her share or part, absolutely, and thereafter to pay over unto him or her any and all cash dividends or interest from the balance of his or her share or part until he or she shall attain the age of twenty-eight years, and when he or she shall attain the age of twenty-eight years to pay over to him or her Thirty percentum (30%) of his or her share or part, absolutely, and thereafter to pay any and all cash dividends or interest from the balance thereof until he or she shall attain the age of thirty-two years, and when he or she shall attain the age of thirty-two years to pay over to him or her the balance or Fifty percentum (50%) of the principal of his or her said share or part, and any accumulated income, absolutely. If either of

my said children, Mary Caven Pew, Joseph Newton Pew, 3rd, Alberta Hensel Pew or Eleanor Glenn Pew, shall die before attaining the age of twenty-four years, twenty-eight years or thirty-two years, as the case may be, leaving child or children him or her surviving, then during the minority of his or her child or children, I order and direct said Trustees to pay over, in equal shares, for the support, maintenance and education of his or her child or children as shall be living, any and all cash dividends or interest on such portion of the fund as their parent would have been entitled to receive the cash dividends or interest therefrom, if living, and upon his or her child or children attaining the age of twenty-one years to divide in equal shares and pay over the principal and any accumulated income thereof to and among his or her child or children as shall then be living, absolutely. If either of my said children, Mary Caven Pew, Joseph Newton Pew, 3rd, Alberta Hensel Pew or Eleanor Glenn Pew, shall die before he or she shall attain the age of twenty-four years, twenty-eight years or thirty-two years, as the case may be, leaving no child or children him or her surviving, then his or her share or the balance thereof shall be equally divided between all of my children, Mary Caven Pew, Joseph Newton Pew, 3rd, Alberta Hensel Pew, or Eleanor Glenn Pew, as may then be living, or their survivor or survivors, and shall form part of his or her share of said principal of said Trust, and any and all cash dividends or interest and the principal thereof shall be paid to him or her in the same manner as the cash dividends or interest and principal of his or her share of said principal shall be paid, as herein provided."

The settlor's daughter, Mary Pew Benson, died on November 28, 1964, at the age of forty-seven. Her will directed that her estate be divided into three equal shares and distributed to her husband, Richard Benson,

and her two daughters, Mary Benson Booth and Ethel Benson Wister. The will was probated on December 8, 1964.

After the filing of the original inventory listing assets valued at approximately $2,420,000, the Internal Revenue Service asserted the decedent's gross estate also included a vested remainder interest in the trust created by her father. The executor consequently filed a supplementary inventory listing the remainder as an asset of the estate and also submitted a first and final account in which he charged himself with the remainder interest. The decedent's daughters took exceptions to both the inventory and the account. The United States and the Commonwealth of Pennsylvania intervened respectively on January 23, 1969 and March 28, 1969.[1a]

Preliminarily, the United States[2] filed objections challenging the jurisdiction of the orphans' court which were dismissed on May 23, 1969. See *Benson Estate,* 19 Fiduc. Rep. 417 (Mont. Co. O.C. 1969). An appeal was taken to our Court but later was withdrawn before argument.

The issue concerning the nature of the decedent's interest in the Pew Trust was then passed upon by the orphans' court on September 24, 1970. Stressing that the decedent had achieved the age of thirty-two and later died while her mother was still alive, the court

---

[1a] By intervening, the United States substantially obviated the issues dealt with in *Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 87 S. Ct. 1776 (1967), concerning state trial courts' indirect determinations of federal tax consequences in "nonadverse" litigation. See generally, Wolfman, *Bosch,* Its Implications and Aftermath: The Effect of State Court Adjudications on Federal Tax Litigation, 3d U. of Miami Institute of Estate Planning ¶69.200 (1969).

[2] As the United States has been the active litigant, for ease of reference we have referred to the Commonwealth of Pennsylvania and the United States as the "government" or the "United States".

determined the decedent's interest was conditioned on her mother's death and that settlor had only intended to benefit living persons. Support for this view was grounded in the opening words of paragraph 3 of the deed of trust: "Upon the death of my said wife, Alberta H. Pew. . . ." These words were viewed as establishing an implied condition to the decedent's taking.

The United States filed numerous exceptions to the adjudication. These were considered by the court and subsequently dismissed on November 25, 1970. This appeal by the United States ensued.

All parties are in accord as to the applicable legal principles, which have often been enunciated by this Court. " 'A testator's intent, unless unlawful, shall prevail; that intent shall be ascertained from a consideration of (a) all the language contained in his will, and (b) his scheme of distribution, and (c) the circumstances surrounding him at the time he made his will, and (d) the existing facts; and (e) canons of construction will be resorted to only if the language of the will is ambiguous or the testator's intent is for any reason uncertain. . . .' " *Pearson Estate*, 442 Pa. 172, 180, 275 A. 2d 336, 339 (1971) (quoting from *Carter Estate*, 435 Pa. 492, 496-97, 257 A. 2d 843, 845 (1969)) (citations omitted). Accord, *Jessup Estate*, 441 Pa. 365, 276 A. 2d 499 (1970); *Matthews Estate*, 439 Pa. 69, 264 A. 2d 714 (1970); *Derham Estate*, 435 Pa. 590, 258 A. 2d 650 (1969).

Although these cases refer to testamentary dispositions, the same principles apply with equal force to the construction of an inter vivos trust. See, e.g., *Pew Trust*, 411 Pa. 96, 106, 191 A. 2d 399, 405 (1963); *Scholler Trust*, 403 Pa. 97, 169 A. 2d 554 (1961); *Wolters Estate*, 359 Pa. 520, 59 A. 2d 147 (1948).

The courts' task in ascertaining a settlor's intent has likewise often been reiterated: "In order to ascer-

tain the actual intent of the settlor or testator, the Court must place itself in his armchair and consider not only the language and scheme of the instrument but also the facts and circumstances with which he was surrounded; and these surrounding facts and circumstances include the condition of his family, the natural objects of his bounty and the amount and character of his property. . . ." *Pew Trust,* supra, at 107, 191 A. 2d at 405 (citations omitted).

While all parties agree that the settlor's intent is the guiding factor, vigorous dispute exists as to what that intent was as manifested in the trust instrument. As we begin our evaluation of settlor's intent, we wish to note our complete agreement with that portion of the able opinion of the orphans' court which discounts the application of common law canons of construction to this case, especially with regard to presumptions of vesting. We hope to continue what the orphans' court termed ". . . the salutary trend of current authority [which] is to allow realization of the substance of intent expressed by a testator short of illegality." As in *Jessup Estate,* supra, we do not approach the issues in this appeal possessed of any constructional preference for early vesting and early indefeasability.[3]

However, our ascertainment of settlor's intent here differs from that of the orphans' court. We are all too aware that ". . . distinguishing between vested and contingent interests remains one of the most perplexing of

---

[3] To clarify our terminology, we will employ the following classical definitions: "A remainder is vested in A., when, throughout its continuance, A., or A. and his heirs, have the right to the immediate possession, whenever and however the preceding freehold estates may determine. A remainder is contingent if, in order for it to come into possession, the fulfilment of some conditions precedent other than the determination of the preceding freehold estate is necessary." Gray, The Rule Against Perpetuities 89 (4th ed. 1942).

all judicial tasks," Rabin, "The Law Favors Vesting of Estates. Why?", 65 Col. L. Rev. 467, 483 (1965).[4] The issue is a prolific source of litigation, and it is well to remember that: "It was truly said more than two hundred years ago, that 'no will has a brother', quoted in Williamson's Est., 302 Pa. 462. This observation applies with equal force to deeds of trust. As Mr. Justice [later Chief Justice] MAXEY said in the case referred to (page 466) : 'This will must be construed by itself on its own unusual phrasing. Each will is its own best interpreter, and a construction of one is no certain guide to the meaning of another'." Scott's Trust, 322 Pa. 1, 16, 184 Atl. 245, 251 (1936).

An examination of the deed of trust now before us persuades us of the correctness of the government's position that the decedent's interest in the remainder vested when she became thirty-two. Settlor's scheme of distribution evinced a belief that as his children reach various levels of age and maturity, they should be entrusted with increased responsibility with respect to the principal of the trust. Thus, a child was to control twenty percent of the principal upon attaining age twenty-four, fifty percent at age 28, and the whole of his or her share at age 32. The settlor made alternative dispositions in the event his children died prior to age 32 leaving children or leaving no children. He made no provision, however, for the possibility that his off-

---

[4] See also, In the Matter of O'Brien, 33 Misc. 2d 484, 487, 229 N.Y.S. 2d 242, 246 (Surr. Ct. 1962) ("no legal question has been more productive of litigation") ; In the Matter of Cohen, 1 Misc. 2d 463, 465, 148 N.Y.S. 2d 117, 119 (Surr. Ct. 1956) ("perennial problem") ; Sparks, "Future Interests", 32 N.Y.U. L. Rev. 1434 (1957) ("one of the most perplexing construction problems"). See generally, Leach, Property Law Indicted 60-63 (1967) ; Halbach, Future Interests: Express and Implied Conditions of Survival, 49 Calif. L. Rev. 297, 431 (1961).

spring would reach age thirty-two and still predecease Mrs. Pew.

In our view, the absence of a disposition in the event of a child's death subsequent to age 32 indicates that the settlor intended to bestow legal ownership to 100% of their respective shares in the trust res on his children at that age, thus effectuating his belief that those of his offspring who attained the requisite age were mature enough to control and dispose of their portion of the estate as they desired. Cf. *Renner Estate*, 358 Pa. 409, 57 A. 2d 836 (1948); *Rickenbach Estate*, 348 Pa. 121, 34 A. 2d 527 (1943). Were this litigation between the three beneficiaries named in decedent's will, we would be loathe to hold on the language of this trust instrument that Richard Benson's one-third interest under his wife's will could be defeated with respect to the assets of the Pew trust remainder here at issue and that only the deceased's daughters could take.

Turning to appellee's contentions, it is urged that it was settlor's intent to benefit only living persons. We have already indicated our disagreement with this particular interpretation of the instrument. The deed of trust clearly demonstrates that the settlor knew how to provide for the contingencies of unexpected death, and he also knew how to transmit interests only to living persons. Thus, for example, in speaking of the possibility that his children might die prior to age 32 leaving no children, the settlor directed that the balance of the corpus ". . . shall be equally divided between all of my children . . . *as may then be living*. . . ." (Emphasis added.) We reiterate our conviction that settlor intended his offspring have a right of ownership in the remainder upon attaining age thirty-two, and only the enjoyment of that right was postponed during their mother's lifetime.

Appellees seek to reinforce their position by alluding to the spendthrift clause of the trust, contending

that by imposing a condition of actual receipt the clause necessitates the decedent's remainder interest was contingent on her mother's death.

We cannot agree. As one distinguished commentator has observed: "§280.1 Effect of Spendthrift provisions on 'vesting'. There are some decisions to the effect that a spendthrift trust clause operates to keep the estate from vesting, and thus makes it invalid under the rule against perpetuities when it would otherwise be valid. There seems to be no basis on which such a conclusion can be supported. A mere restraint on alienation has nothing to do with 'vesting'. It relates only to the power to alienate the interest . . . and the question whether that interest is 'vested' or not depends on the contingencies that may affect the ultimate ownership of the interest—contingencies which do not depend on the power of alienation." Griswold, Spendthrift Trusts 323-24 (2d ed. 1947).

Appellees further assert that to adopt the view urged by the government would frustrate the alleged general purposes of the trust. These they contend were to maintain control of the Sun Oil Company in the Pew family and the diminution of taxes.

Since the trustees had the express power to exchange or sell the Sun Oil Company stock at their discretion for other securities or assets, we see no merit in the contention concerning perpetuating company control in the Pew blood line.

As to the obviation of taxes, it is incontestable that almost every settlor and testator desires to minimize his tax burden to the greatest extent possible. However, courts cannot be placed in the position of estate planners, charged with the task of reinterpreting deeds of trust and testamentary dispositions so as to generate the most favorable possible tax consequences for the estate. Rather courts are obliged to construe the set-

tlor's or testator's intent as evidenced by the language of the instrument itself, the overall scheme of distribution, and the surrounding circumstances.

In light of the governing principles, we are persuaded the only condition established by settlor in his trust instrument as necessary for his daughter's acquiring a vested interest in the remainder of the corpus of the particular trust here in question was the attainment of age 32. Mary Pew Benson reached the required age. Surviving her mother was not an implied condition to ownership of her designated interest in the trust principal.

Accordingly, the decree of the Orphans' Court of Montgomery County is reversed and the record remanded for further consistent proceedings. Costs on the estate.

Mr. Chief Justice BELL took no part in the decision of this case.

Mr. Justice JONES took no part in the consideration or decision of this case.

———

DISSENTING OPINION BY MR. JUSTICE POMEROY:

I respectfully dissent, and would affirm upon the adjudication of the Orphans' Court Division and its opinion dismissing appellant's exceptions to the adjudication.

I add the following observations.

(1) It seems incontrovertible to me that paragraph 3., creating the trust of Sun Oil Company shares involved in this appeal, is flatly conditioned upon the death of the settlor's wife, Alberta H. Pew. Until that occurs, there is to be no division into shares for children, including this decedent, and all the language of that paragraph, spelling out what happens to each share for children, is so far inoperative. The instru-

ment nowhere expressly gives this decedent any interest of any kind in the trust estate, even a right to any portion of income, until the death of her mother; I cannot see the justification for construing it as if it does. In my view, the reading of the majority effectively extirpates the words "Upon the death of my said wife, Alberta H. Pew", which introduce the third paragraph and constitute a precondition to all of its provisions.

The appellees properly cite *Bostwick's Will*, 236 N.Y. 242, 140 N.E. 576 (1923), in support of this construction. Upon closely similar facts, Judge CARDOZO for the New York Court of Appeals held, "Whatever right he [testator's son, in the position of the decedent in this case] had, whether it be classified as vested or contingent, was subject to be divested by his death before his mother."

(2)  In seeking to determine the settlor's intent, I am particularly impressed with the strong and unequivocal language of the spendthrift clause, reproduced in the margin.[1] It is to be noted that the shares of settlor's children *"shall only become the property of the beneficiary and/or* beneficiaries *when actually received by him or her as the case may be."* Moreover, the prohibition in the clause against anticipation or encum-

---

[1] "14. I direct that any and all payments herein provided for my daughters shall be for their and each of their sole and separate uses, notwithstanding any coverture, and payments herein provided for any beneficiary shall not be subject to attachment, execution, sequestration, or to any order of court, and that the beneficiary or beneficiaries shall have no power to alienate or anticipate any payments or encumber the same, whether principal or income, nor shall said principal and/or income be liable for the contracts, debts, or engagements of any beneficiary or beneficiaries but the same shall be paid by my said Trustees to the beneficiary or beneficiaries herein designated, free and clear of all assignments, attachments, anticipations, levies, executions, decree and sequestrations, and shall only become the property of the beneficiary and/or beneficiaries when actually received by him or her as the case may be."

brance of a payment, or share, makes it impossible for a beneficiary to sell or assign part of his or her share to raise the funds wherewith to pay the taxes which are imposed upon the share by the majority's reading, a result hardly consistent with a vested interest.

DISSENTING OPINION BY MR. JUSTICE BARBIERI:

Most respectfully I must disagree with the result reached by the majority. By this result an estate such as that of the decedent in this case, with assets of $2,-519,657.35 at the time of death, and a distributable net of $1,801,629.21 at the audit, could be rendered almost fully depleted, or even gratuitously insolvent, by the imposition of additional taxes based upon property which, as in this case, is not part of the estate. Under the majority's holding, the balance in this case of $1,-801,692.21 (to be further reduced by expenses and costs),[1] would be hit by additional death taxes of at least $1,244,000.00. This means that, at best, out of an estate of $2,500,000.00, the children of this decedent would share roughly only $500,000.00.[2] The majority reaches its decision to allow this result, contrary to the conclusions of the trial judge,[3] on the basis that this is what decedent's father intended when he established the trust in 1932, although admittedly he did this solely for the purpose of avoiding the kind of confiscatory taxation that the majority here approves.[4]

---

[1] E.g., the majority puts the costs of these proceedings on the estate.

[2] I have not attempted to compute the actual effect of the new federal and state death tax assessments, but it is clear that insolvency even of a substantial estate could result from a ruling like that of the majority in this case.

[3] Some testimony was taken before the court below.

[4] One of the incidents to such confiscatory taxation is the required sale of Sun Oil Company stock with a reduction in family control which the settlor sought to avoid.

It is perfectly obvious that the provisions for settlor's children prior to their ages of 32 years are substantively meaningless to them prior to the death of their mother (who yet lives). This is so because the settlor specifically provided that his childrens' shares would be determined *upon the death of his wife,* decedent's mother, at which time the assets would be allocated in equal "parts or shares, one such equal part or share to be held for my daughter, Mary Caven Pew [the decedent, Mary Pew Benson], one such equal part or share. . . ." [for each of his other three children]. Since the trust was established when decedent was only 15 years of age, and her brothers and sisters were 14, 9 and 4 years of age, decedent made clear and familiar provision for them should their mother die during their early years. If she did so die a carefully drawn program was spelled out so that the children would receive their shares in instalments at their ages of 24, 28 and 32. But they would get nothing out of the trust at any of these ages if their mother still lived. The settlor's wife did survive her daughter, decedent herein, who was 47 when she died on November 28, 1964. Nowhere in the trust instrument is there any statement or expressed intent that any of settlor's children would have any interest after 32 or at any time before their mother died. I am convinced that the lower court properly concluded that, under all of the circumstances, it could not be construed that the settlor in this case intended a technical vesting in his children that would be worthless to them.

The majority quotes as the basis for its determination of settlor's intent from *Pew Trust,* 411 Pa. 96, 107, 191 A. 2d 399, 405 (1963), as follows: "In order to ascertain the actual intent of the settlor or testator, the Court must place itself in his armchair and consider *not only the language and scheme of the instru-*

*ment* but *also the facts and circumstances with which he was surrounded;* and these surrounding facts and circumstances include the condition of his family, the natural objects of his bounty and the amount and character of his property. . . ."

I cannot agree with the majority's view that the settlor, "in his armchair" in 1932, when signing a document the purpose of which was to avoid decimation of his assets by Federal taxes on estates, could possibly have had the "actual intent" to provide the devastating taxation against his daughter's estate that the majority thinks he intended.

I dissent and would affirm upon the opinions of the lower court.