## Hermann Trust.

Argued March 14, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Gilbert E. Morcroft,* for appellants.

*Norman R. Schade,* with him *Campbell, Thomas & Burke,* for appellee.

OPINION BY MR. JUSTICE POMEROY, November 26, 1973:

Pittsburgh National Bank, as corporate trustee of a charitable trust established by John A. Hermann, Jr., now deceased, petitioned the Orphans' Court Division

of the Court of Common Pleas of Allegheny County for approval of an interim account of the affairs of the trust. Appellants, individual trustees of another charitable trust of the same settlor, filed exceptions which were overruled by the court below in an order which approved the bank's second and partial account. Hence this appeal.

There are involved here two separate trusts, although only one is presently before the Court in this proceeding. The first is an intervivos trust created in 1939 by a conveyance of the settlor, John A. Hermann, Jr., to five individual trustees, including himself. By this deed of trust Mr. Hermann established the John A. Hermann, Jr. Memorial Art Museum, intended to be a free "public art museum", conveying to the trustees thereof his personal collection of paintings, ivories, bronzes and other objets d'art, together with a plot of land and a residence thereon situated in the Borough of Bellevue, Pennsylvania.[1] We will refer to this trust as the "museum trust".

The second trust is a testamentary trust created by Mr. Hermann in his will, executed in 1940 (the testator died in 1942). Under the terms of this trust, $75,000 was transferred to Peoples-Pittsburgh Trust Co., predecessor of the present accountant, as trustee to hold, invest and reinvest, and to pay the net income to the museum trustees "for the maintenance, repair and improvement of the museum and real property connected therewith."[2] The trustee of this testamentary trust,

---

[1] This trust in 1944 received a ruling from the Commissioner of Internal Revenue that it was exempt from federal income taxation under Section 501(c) of the Internal Revenue Code as a trust established for educational purposes.

[2] Mr. Hermann had in his lifetime given $25,000 to the Peoples-Pittsburgh Trust Co. as trustees with direction to pay the income to the museum trustees. The further testamentary trust for the same purpose was, according to Mr. Hermann's will, to discharge an

appellee here, is not, it should be noted, a trustee of the museum trust.

The intervivos trust which created the museum was in perpetuity. The testamentary trust, however, provided that "[i]f ever the Art Museum shall cease to exist the principal and any unused income shall be held thereafter by Peoples-Pittsburgh Trust Company, as Trustee, for the same uses and purposes as are herein set forth for my residuary estate."

In 1954 the trustees of the museum trust instituted proceedings in the Court of Common Pleas of Allegheny County to have the trust terminated. The residence in which the art collection was housed had become dilapidated and expensive to maintain, and income was insufficient to build a new building or to undertake a major renovation of the old one. The petition sought, in terminating the trust, to have the trustee of the testamentary trust take over all the objets d'art of the museum. The trust company opposed the petition, arguing that it was a trustee only of funds totalling $100,000 and that it was not responsible for what might become of the settlor's art collection. The court refused to declare a termination, but by its order, entered August 16, 1955, authorized the individual trustees of the museum to sell the land and building (this was done, producing $91,300), to transfer the art to a floor of the public library building in Bellevue, Pennsylvania, and to con-

---

undertaking by him to the other museum trustees to fund the operation of the museum (apparently in the total sum of $100,000). The $25,000 intervivos trust is not here involved, notwithstanding the fact that the parties and the lower court often speak of the two ($25,000 and $75,000) as the same trust. For purposes of this opinion, we will not distinguish between the smaller intervivos trust and the larger testamentary trust.

A tax question involving the $25,000 intervivos trust was before this Court in *Hermann Estate*, 349 Pa. 230, 36 A. 2d 804 (1944).

duct the activities of the museum at that site. The museum has remained at this location until the present time. The income of the invested assets since 1955 has consistently far exceeded maintenance expenses.

Following enactment of the Federal Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, the corporate fiduciary, as trustee of principal funds of $100,000,[3] refused to pay over to the individual trustees of the art museum the income received by the bank for the last quarter of 1970 and all subsequent quarters to date. Its reason for refusing was not that the purpose of the trust of which it was trustee had failed or that the purpose of the museum trust had failed; its refusal to pay over income was based, rather, on its opinion that income so distributed to the museum trustees would be considered as made to an entity which was not an "operating foundation", with the result that its income payments would not qualify as tax exempt "qualifying distributions" and so would be subject to a severe federal tax under section 4942 of the Internal Revenue Code of 1954, as amended by the Tax Reform Act of 1969, Pub. L. 91-172.[4]

---

[3] This is the combined principal amount of the intervivos trust of $25,000 (see note 2, *supra*) and the testamentary trust of $75,-000.

[4] Section 4942 of the Internal Revenue Code is entitled "Taxes on Failure to Distribute Income." It applies to a "private foundation" which is defined as an organization *generally* exempt from income taxation under section 501 of the I.R.C. of 1954, but within the definition of section 509 of the I.R.C. of 1954, added by Pub. L. 91-172. Suffice it to say that there is no dispute here that the John A. Hermann, Jr. Memorial Art Museum is other than a "private foundation" within these statutory provisions. As such, it must, to avoid payment of a tax, be an "operating foundation"; that is to say, must make "qualifying distributions" of its income "directly for the active conduct of the activities constituting the purpose or function for which it is organized . . .", §4942 (j)(3). If it is *not* an "operating foundation", then under §4942(a), its nondistributed income is subject to a 15% tax, and, if the income

The reason that the appellee thought the museum not to be an "operating foundation" was that since the sale of the original building with court approval in 1955 and transfer of the settlor's collection to a floor of the library building in Bellevue, income of the bank trust had far exceeded expenses associated with maintaining the museum in such reduced surroundings. It would follow that the excess would not be expended "directly for the active conduct of the activities constituting the purpose [of the museum]." 26 U.S.C. §4942 (j)(3)(A) (1970).

The individual trustees of the museum sought to allay the bank's fears that the museum was not an entity to which "qualifying distributions" might be made by requesting, on May 24, 1971, a federal tax ruling on the matter. Under §4942(g)(2) of the I.R.C. of 1954, as amended, the Secretary of the Treasury (or his designate) is empowered to authorize a "set-aside" of undistributed income (otherwise taxable under §4942) *if* the "set-aside" is to be expended on a specific project within 5 years, the project is one associated with the purposes of the foundation, and the project is one better accomplished through accumulation. The project proposed by the individual trustees was the acquisition of suitable land and the construction of a museum building within the next five years. Proposed expenditure for land was $50,000 and for the building was $250,000. On March 16, 1972—after the first hearing

so taxed is not distributed by the end of a "correction period" (defined, generally, as three months after receipt of a deficiency notice), the provision of §4942(b) taxes the remainder to the extent of 100%. It was the position of the corporate fiduciary that if it distributed income to the trustees of the museum, these payments would not be "qualifying distributions" because made "to . . . a private foundation which is not an operating foundation", §4942(g) (1)(A), that such distributions would be income subject to the 15% tax (if not the 100% tax), and that therefore such nonqualifying distributions should not be made.

before the auditing judge in this matter, but before the second—the Secretary's designate responded and approved a "set-aside" of $8,400 for 1972 and indicated that upon submission of evidence of further planning (option to purchase real estate, architect's drawings, cost estimates, etc.), he would extend the authorization to set-aside income for four additional years.

The account of the appellee-trustee indicated the fact of withholding the accumulated income, and its petition for distribution, after reciting most of the foregoing history, sought approval of the account and the proposed "deviation" from the terms of the trust.[5] The auditing judge considered, as stated in his opinion, that the petition "raises the question as to whether or not the Museum is still in existence", and concluded that "the purposes of the Museum trust have failed. There is no question about this." In a later portion of his opinion the court stated the conclusion that "the Museum [has] ceased to exist."

It was the premise of the appellee-corporate trustee in filing its account here in audit that should trust income distributed to the museum trustees be taxable under section 4942 of the Internal Revenue Code (see Note 4, *supra*), then it would be justified in refusing

---

[5] See The Charitable Instruments Act of 1971, June 17, 1971, P. L. 181, §4, 10 P.S. §204 (Supp. 1973-74) : *"Deviation from terms of instrument.* Nothing in this act shall preclude a court of competent jurisdiction from authorizing a deviation from the express terms of an instrument governing a charitable organization." The Charitable Instruments Act was enacted in response to section 101(a) of the Tax Reform Act of 1969, Pub. L. 91-172, 26 U.S.C. §508 (1970), which requires, *inter alia,* that a "private foundation" have in its governing instrument a provision which requires "income for each taxable year to be distributed at such time and in such manner as not to subject the foundation to tax under section 4942", and, in the case of pre-Tax Reform Act of 1969 trusts, requires that efforts be taken to have a court of competent jurisdiction "reform" the governing instrument to so require.

to make distributions commanded by the trust instrument. We do not think that the conclusion necessarily follows. Should such distributions precipitate the first step, or 15% income tax, we doubt that the corporate trustee would thereby be justified in refusing further distributions. The mere fact of imposition of a tax is insufficient reason to conclude that the settlor would want his trustee to cease making *all* distributions.[6] Should such distributions further result in a 100% taxation of the income, a considerably more difficult question would arise. It is, however, not necessary for us here to grapple with new legal issues caused by the impact of section 4942 of the I.R.C. on the law of charitable trusts in Pennsylvania, and particularly whether that impact could be said to render the purpose of the trust "indefinite or impossible or impractical of fulfillment."[7] It is enough to observe that the ruling obtained from the Internal Revenue Service by the museum trustees, approving a "set-aside" and thus staying the imposition of section 4942 tax, has caused any such issues to disappear from this proceeding. The income which the appellee-corporate trustee has withheld is, for our purposes today, as immune to taxation as it was before the enactment of section 4942.

As to the learned auditing judge's conclusion that "the Museum [has] ceased to exist", with all respect, we do not agree that failure of the testamentary trust is even raised by the petition for distribution. The penultimate paragraph of the petition, reproduced in the margin,[8] while perhaps not as lucid as one might wish,

---

[6] See *Weiss Estate*, 454 Pa. 114, 309 A. 2d 793 (1973) ; *Benson Estate*, 447 Pa. 62, 72-73, 285 A. 2d 101 (1971).

[7] Section 10 of the Estates Act of 1947, April 24, 1947, P. L. 100, 20 P.S. §301.10, repealed and reenacted in the same language by §6110 of the Probate, Estates and Fiduciaries Code, June 30, 1972, P. L. 508, No. 164, 20 Pa. S. §6110 (Special Pamphlet).

[8] " TWENTY-THIRD : Petitioner further represents that the Second and Partial Account before your Honorable Court was filed

is not an allegation of failure of purpose or of cessation of the museum or the museum trust to exist. It is rather a suggestion to the auditing judge that there was no present need for the court to examine, by appointment of a master or otherwise, whether the purpose of the trust had failed, in view of the fact that the Secretary of the Treasury, in undertaking to act upon the "Request for Approval of Set-Aside" filed by the museum trustees, would necessarily examine the manner of operation of the museum.[9]

---

for the purpose of securing approval of its administration of this Trust up to date, and for the further purpose of securing a determination of your Honorable Court as to whether the charitable educational purpose of the Trust had failed. At that time it appeared that the persons who were the Settlor's object to educate into appreciation of artistic values were either devoid of any sense of artistic appreciation, as they did not even visit the Museum, or the objects which were supposed to be the means of arousing that sense of artistic appreciation possessed no inherent qualities of art. Petitioner therefore *intended* to request your Honorable Court to appoint a Master, under the authority vested in it, who was qualified by education, and experienced in matters of art, to investigate and to make recommendations to your Honorable Court in relation to his examination and investigation. Petitioner realizes, however, that such an examination by a Master appointed in this proceeding, and any determination made herein, would be (aside from the matter of taxation of this Trust) ineffective in relation to the John A. Hermann, Jr. Memorial Art Museum Trust (Deed-Exhibit "B"). In 1955, when the Order of Court (Exhibit "D") was entered, it was entered by the Court of Common Pleas, an entirely different Court.

Presumably, the United States Secretary of the Treasury, or his Deputy, and his Agents will pursue the same course of inquiry, examination, and inquiry, vis a vis the Request for Approval of Set-Asides (Exhibit "E"). He may, as the Tax Reform Act of 1969 provides, refer the matter to the Attorney General of the Commonwealth of Pennsylvania who is already a party to this proceeding."

[9] This interpretation of paragraph TWENTY-THIRD is borne out by a dialogue between the court and appellee's counsel at the first audit hearing, during which the court endeavored to ascertain

Not only was the question of continued existence of the museum trust not presented by the petition for distribution, but there was no attempt by the corporate trustee to offer any proof for such a proposition; it adduced no evidence whatever beyond the averments of the petition for distribution. The only witness called at the audit was an individual trustee of the museum trust. His testimony dealt solely with his efforts to

exactly what the appellee sought in its petition for distribution. The following are relevant extracts therefrom: *"Counsel for accountant:* . . . The problem is, has the trust failed, or . . . and if it has failed, then we have wasted a lot of time. But we haven't determined whether it has failed or not. *The Court:* Do you want that resolved now? *Counsel:* No, I can't say that I do. *The Court:* . . . What am I supposed to do with this case? *Counsel:* Let me answer that question this way. If I were to answer you, yes, I'd like to have that resolved. The Court will then be undertaking an examination and determination that if my opin—in my opinion has—is currently being covered by the Treasury Department."

. . .

*"The Court:* . . . I wanted to know if this is a question for me to determine here and now, regardless of when and what the Treasury Department decides, or if I should wait until the Treasury Department does resolve it. *Counsel:* [My suggestion is that the court] retain jurisdiction of this matter until such time as the Treasury Department of the United States or its duly authorized agent, or agencies, make determination of whether the trusts to the individual trustees of real estate and personal property, is an operating trust, or until such time as the Treasury Department of the United States shall approve a pending Set-Aside request. . . . *The Court:* Is that all? *Counsel:* As far as I can see, that's all."

. . .

*"The Court:* What you are asking is that the Court suspend distribution for the present until the Treasury Department acts. *Counsel:* That is right. . . ." At the second audit hearing, following the favorable tax ruling, the position of the museum trustees, as stated by their counsel, was that the court had before it only a single question: "[I]s the [corporate] trustee correct in [with] holding the payment of income to the Hermann Art Memorial Museum." Counsel for the corporate trustee did not disagree, although noting that "the subject matter of the Art Museum was dubious."

obtain a favorable tax ruling from the Internal Revenue Service. The only evidence, if it can be called that, relied upon by the appellee to support the finding of failure is a statement in the petition of the museum trustees *in 1955* for leave to terminate the trust. It was there alleged that the museum and its objets d'art "have been almost totally ignored by the public during the past five years, the current rate of visitation thereto by the general public being one person per month."[10] But this petition was refused, as noted above, and the court directed that, with modification, "the Trust known as the John A. Hermann, Jr. Memorial Art Museum *shall continue in being."* (Emphasis added.) Appellee also points to a statement at audit by appellant's counsel that, "I would not kid the court, the art is miserable." Counsel, of course, is no more qualified than is the court to make such a judgment, and this offhand, perhaps jocular remark cannot be considered evidence against the client, the museum trust.[11] The lower court

[10] We have doubts that the frequency of visitation by the general public is any proper part of the definition of "museum". The Random House Dictionary of the English Language (1967) defines the word as "a building or place where works of art, scientific specimens, and other objects of permanent value are kept and displayed." If the general public must actually visit with some measurable frequency an artistic or scientific collection, then the tastes of the current generation of society could, upon application to a court of competent jurisdiction, result in the destruction of the efforts of settlors of museum trusts to preserve the past in the hopes of enlightening the present and the future. Certainly there are valuable museum collections which, owing to their obscure location or to the obscure nature of the subject matter displayed, are only rarely visited by the general public. It is doubtful that such a fact bears on whether they are or are not "museums".

[11] Counsel was then asked by the lower court "why would you build a building for art objects that don't deserve it?" Counsel answered, quite properly in our view: "For the same reason the original Trust was set up, and for the same reason this Court said in [1955] to keep it going. And these paintings at that time were

terminated this trust for the sole reason that the art it is designated to support "does not warrant the maintenance of a building" and that the public continues to ignore the display. It is difficult to conceive of a subject less appropriate for judicial review than the quality of an artistic work; certainly judicial condemnation is nowise justified by this record.[12] If Mr. Hermann's collection is as poor as the appellee contends, it well may be that he entertained a certain insensitivity toward prevailing tastes in "art". There is no indication in his trust instruments nor precedent in the law for judicial review of the question whether Mr. Hermann's museum "does [or does] not warrant the maintenance of a building."[13]

In sum, our review of the record is that there was *no evidence* that the purpose of the trust had been made impossible of fulfillment or that the trust res, the museum, had ceased to exist.[14] To the contrary, the record

examined by the Curator of the Carnegie Museum. There are some art objects other than the paintings such as pieces of jade and so forth that are quite valuable. I am going on the assumption that this Court determined in [1955] when the situation was far worse than it is now, that we had to continue."

[12] The court below did not itself view the art: "We had considered the appointment of a Master to make an investigation and report on the question raised herein, but decided against this action, as it is clear from the record that the particular trust before us has failed." Record at 124a.

[13] We do not mean to imply that the value of an artistic work is *never* a justiciable question. Were the issue here the fair *market* value of one of the Hermann works, a court could properly hear experts testify to the price at which such a work would sell. But where the question is not one of *market* value, but rather of artistic merit on some absolute scale, a court is powerless to act.

[14] The conditions for termination of a charitable trust are set forth in §10 of the Estates Act of 1947. See note 7, *supra*. The court may order an administration or distribution of the estate "if the charitable purpose for which an interest shall be conveyed shall be or become indefinite or impossible or impractical of fulfillment. . . ." See *Curry Appeal*, 390 Pa. 105, 109, 134 A. 2d 497

evidence does establish that the museum trust has principal and assets of approximately $250,000, of which $180,000 represents undistributed income.[15] It is apparent that the objets d'art exist, that adequate funds are now on hand to acquire land and to construct a building, and that the individual museum trustees intend so to act within the next five years.

The balance for distribution should be decreed back to the appellee Pittsburgh National Bank as trustee, as the court below did by its decree here appealed from, but not for administration pursuant to the court's opinion of June 27, 1972; rather, the accountant should be directed to hold and administer the trust funds in accordance with the terms of the testamentary trust of the decedent, viz., to invest and reinvest the same and pay over all income to the trustees of the museum trust.

Decree reversed and case remanded for entry of a decree in accordance with this opinion. Costs on appellee as trustee.

(1957). For a discussion of trust termination for failure of purpose, see generally Wright, Termination of Trusts in Pennsylvania— Some Current Trends, 115 U. Pa. L. Rev. 917, 925-929 (1967). See also Restatement (Second) of Trusts §335 (1959) ("If the purposes for which a trust is created become impossible of accomplishment or illegal, the trust will be terminated").

[15] The major portion of this undistributed income was accumulated before enactment of the Tax Reform Act of 1969 and hence is not subject to the 15% tax of that Act. See note 4, *supra*.