J-A13031-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: JAN TAREN TREMBLEY, AGENT FOR WINFIELD SCOTT LASSER UNDER DURABLE GENERAL POWER OF ATTORNEY | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: JAN TAREN TREMBLEY | : : : | |
| | : | No. 1690 EDA 2020 |

Appeal from the Order Entered August 26, 2020
In the Court of Common Pleas of Chester County Orphans' Court at
No(s):  No. 1519-1119

BEFORE:   BENDER, P.J.E., DUBOW, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                    Filed: July 8, 2021

Appellant, Jan Taren Trembley, appeals from the August 26, 2020, order

entered in the Court of Common Pleas of Chester County, Orphans' Court,

denying the petition for attorney's fees and expenses, and making final the

June 8, 2020, order granting, in part, and denying, in part, the Petition for

Citation to Void the Beneficiary Designation and to Reinstate the Status Quo

filed by Alexandra Archbold, William Lasser, and Gwendolen Lasser.  After a

careful review, we affirm.

The Orphans' Court has exhaustively set forth the relevant facts and

procedural history underlying this matter as follows:

1.     Winfield Scott Lasser ("Scott" or "decedent") was married
previously to Cassandra K. Archbold [("Cassandra")], his second
wife.  To them were born three children, Petitioners Alexandra

---

* Former Justice specially assigned to the Superior Court.

Archbold, William Lasser, and Gwendolen Lasser (collectively the "Children").

2.     When this marriage broke up, Scott and Cassandra entered into a Property Settlement Agreement ("PSA").

3.     Paragraph 13 of the PSA specifies that:

The parties have agreed that Husband [(Scott)] shall pay for all tuition and expenses for his three children to attend a four (4) year University such as the University of Virginia or the University of North Carolina.

4.     The PSA was executed on September 18, 2001[,] when the [C]hildren were ages 6, 5[,] and 2, respectively.

5.     Some years later, Scott was married for the third time to Jan Taren Trembley ("Jan"), who is the [Appellant] in this case.

6.     Scott and Jan entered into a Prenuptial Agreement dated June 4, 2009.

7.     Scott's assets, listed as Schedule B to the Prenuptial Agreement, indicate that he possessed:

401(k)                          $60,000.00

IRA                             $1,000.00

Life Insurance through work  $95,000.00

8.     Paragraph 3 of the Prenuptial Agreement states that Jan owns residential property located at *** Candytuft Lane, East Goshen, West Chester, PA, titled in her name alone.  Other assets of hers [were] listed on Schedule A.  Those assets total almost $1 million.

9.     Paragraph 4 of the Prenuptial Agreement states that:

The parties recognize at the time of their intended nuptials that Scott is **obligated by Court order** to pay child support and **college tuition** for his children of a prior union.  His ability to contribute to the marital household for some time is restricted.  Accordingly, it is Scott's **desire** to designate Jan as the beneficiary of his employment retirement benefits at DeLage Landen Financial Services in the event of his death and as consideration for her contribution to the household.

10.	Scott had previously gone through bankruptcy and eventually lost his job at DeLage Landen.

11.	When Scott was terminated by DeLage Landen, his retirement benefits were rolled over into one or more Vanguard individual retirement ("IRA") accounts.

12.	No evidence was presented as to what happened to his life insurance.

13.	His finances were precarious. His retirement benefits were his major asset, the only asset that could possibly fund his children's college expenses.

14.	Daughter, Alexandra Archbold, attended Elizabethtown College from 2013 to 2017. Scott paid for her freshman year. Jan sent Alexandra approximately $10,000 shortly after Scott's demise.

15.	Alexandra needs four (4) more credits to graduate. The amount of her student loans approaches $80,000.

16.	Gwendolen Lasser started at Ursinus College in August of 2016. Scott paid for her first year.

17.	William [Lasser] attended Lock Haven University for two (2) years from 2013 to 2015, as well as Delaware Community College. He owes about $15,000 to Lock Haven University. He is not currently in school. He testified that he was not likely to pursue any further college education.

18.	Scott was diagnosed with ALS.

19.	Scott and Jan met with attorney Lisa Hall, Esquire in 2014 to discuss estate plans.

20.	However, it was not until Scott's illness had progressed that they followed up with her in 2017 when Scott was in the hospital. As a result of these meetings, Ms. Hall prepared, and decedent signed, a Will and a General Power of Attorney. Both documents are dated June 13, 2017.

21.	The very last paragraph of the Will, ¶12, states:

> My children, ALEXANDER LASSER, WILLIAM LASSER[,] and GWENDOLEN LASSER are intentionally not named as Primary Beneficiaries under my Will not for the lack of love for them, but because I have specifically provided for my children via a certain beneficiary directed account.

- 3 -

22. Alexandra Archbold testified that her father set aside $210,000 in IRA accounts for the educational expenses of her and her siblings. This testimony was not disputed in any way.

23. Ms. Hall went over the Power of Attorney and Will with Scott alone. She testified that she goes through such documents closely with her clients. She reminded him that powers of attorney are "powerful documents."

24. She satisfied herself that Scott understood, despite obvious physical debility, what assets he had, the objects of his bounty, and the import of the documents.

25. The [C]hildren contend, however, that by the date of the Will, Scott was insentient. They testified about their interactions with him around the time in question.

26. As the months went by, Scott became increasingly debilitated. He had great difficulty speaking. He was confined to a wheelchair until such time as he could no longer use that.

27. As Scott continued to worsen, Jan continued to work every day 5:30 a.m. to 7:00 p.m. in June, July, August, and September, through the date of [Scott's] death. She hired health aides to attend to Scott at home around the clock.

28. The [Children] contend that this constituted an excessive use by Jan of Scott's money for his care.

29. As of August 2017 the retirement funds were still at Vanguard. Vanguard would not process Jan's request to be named as the beneficiary.

30. Instead, after two (2) meetings, the Philadelphia office of Schwab agreed and began to process Jan's request through the use of her power of attorney.

31. At the time of Scott's death, Schwab had completed only a partial transfer of the assets; the stock and mutual funds did not come over until a few days after Scott died.

32. Jan eventually received the $210,000 of retirement benefits.

33. She put $130,000 of the funds into her Wells Fargo account to reimburse herself for the expenses of Scott's care and final illness.

34. The remaining $80,000 was used to defray funeral costs and some other expenses. She paid for attorneys' fees out of her own pocket in the amount of $9,000 because there was no money left in the estate.

35. [Jan] also used the proceeds that were intended for the [Children] to install new gutters on her house and new exterior lighting, as well as major plumbing work, which has all inured to her own personal benefit.

36. Jan testified that she understood she was to pay for Scott's care and his funeral expenses and, if need be, her own assets, even her house, could be used to pay for his expenses[.]

37. The evidence established that Jan had sufficient personal assets to pay for the expenses listed in Exhibit P-8 (which includes those expenses broken down into Exhibits R-5, R-6, R-7 and R-8), including the following:

    a. Money she inherited from her mother and about which she testified; and

    b. A home located at **** Candytuft Lane, West Chester, PA, which she purchased in 2009 for $485,000[.]

38. As for her Candytuft Lane home, [Jan] refinanced to a fifteen (15) year mortgage in 2016, and the current balance on the mortgage is approximately $260,000, leaving at least $225,000 in equity.

39. On August 23, 2017, Jan gave $10,000 of her separate funds to Gwendolen and $10,000 of her separate funds to William. Insofar as these are included in the amount Jan "spent" ($104,009.94), she is seeking reimbursement.

40. Jan claims to have paid the following expenses with the retirement account proceeds:

    a. $27,930 in federal and state taxes;

    b. $16,017.85 in estate legal expenses;

    c. $496.75 in estate filing and advertising expenses;

    d. $20,043 in funeral and burial expenses;

    e. $31,979.15 in miscellaneous expenses (total of Exhibit R-5 and R-6, less the $20,000 paid to William Lasser and Gwendolen Lasser in August 2017);

    f. $94,448.37 in health aide expenses, prior to Scott's death; and

g. $13,800 in health aide expenses, *after*, Scott's death, which by definition were expenses to care for and assist Jan rather than to care for Scott.

41. [Jan] paid in excess of $108,248.37 to health care aides for services between June 2017 and March 2018 (including six months *after* [Scott] had passed away).

42. All of the checks to health care aides were written out by Rachel Brodman Ortega, who was the primary health aide.

43. [Jan] allowed Rachel Brodman Ortega to fill out the checks to all of the health care aides, without maintaining any records of the hours that were worked by each aide.

44. [Jan] testified that all of the health aides were paid $25 per hour, and sometimes more (but she could not say who was paid more, when they were paid more, or how much more they were paid); however, [Jan] has no records or timesheets that would reflect the hours worked by any of the health aides. Moreover, although [Jan] testified that at times she paid more than $25 per hour to the health care aides, all of the checks in Exhibit P-9 are in amounts that are multiples of $25.

45. Although [Jan] testified that Rachel Brodman Ortega kept track of the aides['] hours, that [Jan] reviewed the records before signing the checks, and that [Jan] somehow knew how long the aides were present and work[ed] each day, [Jan] admitted that she worked five days a week in Philadelphia—throughout [Scott's] entire last illness including May 2017 through his death in September 2017 and beyond-and left home every day at 5:30 AM and would not return home until 7:00 PM each day.

46. One aide, Patricia Keller, was paid $32,100 between July 3 and September 12, 2017, which equates to 1,284 hours at $25 per hour in approximately two and one-half months. The total number of hours that exist in two and one-half months—counting 24 hours pers day—is 1,800. Moreover, during the month of August 2017, Ms. Keller was paid the equivalent of…644 hours, even though August only has 744 total hours in the month (31 days times 24 hours), and even though [Jan] testified that Ms. Keller went to Pittsburgh for periods of time during August 2017.

47. For certain periods of time, Rachel Brodman Ortega filled out checks payable to her mother, Naomi Brodman, rather than herself as the actual service provider.

48. Another aide, Anthony Mosely, was paid $17,425 between June 30, 2017[,] and October 19, 2017, which equates to 697 hours at $25 per hour during that time period.

49. Another aide, James Shanahan, was paid $11,950 during July to October 2017, which equates to 478 hours at $25 per hour during that time period, even though he had been providing service as a volunteer initially.

50. Another aide, Karen Duda, was paid $7,075 between July 14 and October 13, 2017, which equates to 283 hours during that time period.

51. Rachel Brodman Ortega's handwriting appears on checks made payable to John Egan, who was not identified as [a] health care aide.

52. [Jan] admitted that health care aides were paid for simultaneously sleeping on the couch and for four (4) of them simultaneously gathering outside of the hospital before or after visiting Scott there.

53. As set forth on Exhibit P-9, between August 4 and August 10, 2017, [Jan] paid five (5) separate health aides a total of $23,375, which equates to…935 hours at $25 per hour for six (6) days. This amount of hours in 6 days is not even possible—five aides working 24 hours a day for 6 straight days would "only" work 720 hours.

54. [Jan] claims she paid health aides $25 per hour to attend bereavement counseling sessions in her stead so that she could go to work every day, when those bereavement classes were intended to help *her* cope with the passing of Scott.

55. On May 22, 2019, [the Children] filed their Petition for Citation to Void the Beneficiary Designation and to Reinstate the Status Quo seeking to surcharge [Jan] and to require her to file an account.[1]

---

1 [Jan] filed preliminary objections to the Petition for Citation. She argued therein that [the Children] (1) lacked standing and (2) their claims were untimely and barred by the statute of limitations. On September 4, 2019, the court disposed of the preliminary objections, overruling the same. The [parties] did not bring forth any new evidence that would warrant a change in the court's decision.

Orphans' Court Opinion, filed 6/8/20, at 1-10 (citations to record omitted) (bold and italics in original).

Jan filed an answer to the Children's Petition for Citation, and on March 12, 2010, the Orphans' Court held a hearing, at which Cassandra (Scott's second wife), Jan, and the three Children (Alexandra, William, and Gwendolen) testified.

Following the hearing, on June 8, 2020, the Orphans' Court filed an opinion and order, which granted, in part, and denied, in part, the Children's petition. In its opinion, the Orphan's Court made the following "Conclusions of Law":

1.  Jan Trembley did not exercise undue influence upon decedent.
2.  Decedent had the requisite mental capacity to execute the Will and Power of Attorney.
3.  Decedent's Will and Power of Attorney are valid documents.
4.  However, [Jan's] exercise of the Power of Attorney to change the beneficiary of the directed retirement account is invalid.
5.  The retirement benefits were the subject of a contract and court order and the exercise of the authority was prohibited thereby.
6.  [Jan] breached her duty owed to decedent and her duty under the Power of Attorney.
7.  The [C]hildren do not owe her $10,000.
8.  [Jan] did not act in good faith to preserve [decedent's] estate plan.
9.  To the extent no funds remained in decedent's estate upon his death, [Jan] was personally responsible to pay for all of [the] funeral, burial, legal, health care, and other related costs and expenses reflected in Exhibit P-8.

- 8 -

10. All of the expenses that [Jan] paid with the proceeds of the retirement account were expenses of the estate or the personal responsibility of [Jan] as spouse, and none should have been paid with the proceeds of the retirement account.

11. To the extent that the Estate's proceeds or [Jan's] personal assets were insufficient to pay for the expenses that are set forth in Exhibit P-8, those insufficiencies were partly the result of [Jan's] conduct.

12. Much of what [Jan] claims to have spent money on was wasteful, excessive, and in many instances not for [decedent's] care.

13. [Jan's] waste included using retirement proceeds to pay for her own personal care after decedent's passing.

14. [Jan] breached her duty to select and monitor the primary health care aide, Rachel Brodman Ortega, and the other health care aides that were paid with the proceeds of the beneficiary directed retirement account.

15. [Jan] paid grossly excessive and often duplicative fees to health care aides.

16. [Jan] did not prove any defense to her breach of duty.

* * *

19. [Jan] will be surcharged in the amount of $210,492.44, which is the total value of the proceeds that were in [decedent's] beneficiary directed IRA on the date of his death and which [Jan] took for herself.

20. The beneficiary designation changes made on September 18, 2017, and September 20, 2017, on Schwab IRA account number **** shall be reversed thereby reinstating the status quo existing immediately before the beneficiary change.

21. Petitioners Alexandra Archbold, William Lasser, and Gwendolen Lasser shall each be designated one-third (1/3) beneficiaries of decedent's IRA.

* * *

24. [The Children's] request that the court order an account of the agent under 20 Pa.C.S.A. § 5601.3(b)(4) is denied.

25. [The Children] take nothing under the Will because [Jan] survived the decedent by thirty (30) days.

26. An account is not necessary or useful in this case.

27. With [Jan's] disgorgement of the $210,492.44, the gross amount of the retirement benefits, [the Children] will be made whole. They would not have received anything in addition, even had there been no beneficiary change.

*Id.* at 19-23.

Thus, the Orphans' Court ordered the following:

1. [The Children's] request for reversal of the beneficiary designations to the status quo immediately before the change made by [Jan] is GRANTED;

2. Jan shall redistribute the retirement proceeds in an amount not less than $210,492.44, in equal one-third (1/3) shares to Alexandra Archbold, William Lasser, and Gwendolen Lasser within thirty (30) days of the date of this order.

3. [The Children's] request for an accounting from [Jan] is DENIED. It is further ORDERED that [the Children] may submit a petition for award of counsel fees within thirty (30) days of the above date. Any response by [Jan] shall be filed within thirty (30) days of the filing of the fee request. The court will decide on the papers whether and to what extent an award of fees is warranted. To avoid confusion, that future decision—not this one—will be the final order for purposes of any appeal to a higher court.

Orphans' Court Order, filed 6/8/20, at 1-2.

On July 7, 2020, the Children filed a petition for attorneys' fees and expenses, and Jan filed a response in opposition thereto. On August 26, 2020, the Orphans Court filed a "Final Order." Therein, the Orphans' Court denied the Children's petition for attorneys' fees and expenses.

- 10 -

On September 9, 2020, Jan filed a motion for reconsideration, as well as a notice of appeal.[1] On September 22, 2020, the Orphans' Court denied Jan's motion for reconsideration. All Pa.R.A.P. 1925 requirements have been met.

On appeal, Jan sets forth the following issues in her "Statement of the Questions Involved" (verbatim):

> 1. Whether the retirement funds in question were actually the property of the Appellant and not the Decedent.
>
> 2. Whether Appellant, Jan Taren Trembley, was personally responsible for all of the medical bills and expenses of the Decedent, Winfield Scott Lasser, pursuant to the Doctrine of Necessaries as applied in ***Swidzinski v. Schultz***, 340 Pa.Super. 422, 493 A.2d 93 (1985), and which is presently codified in 23 Pa.C.S.A. § 4102, when the Decedent had assets in his name.
>
> 3. Whether Appellant had authority to change the beneficiaries of the Decedent's retirement funds.
>
> 4. Whether the Court below should have evaluated the individual expenses incurred by Appellant, as opposed to rejecting all of them.

Jan's Brief at 7-8 (Orphans' Court holdings and suggested answers omitted).

_____

[1] We note that Pennsylvania Orphans' Court Rule 8.1 prohibits a party from filing a post-trial motion or exception to any order or decree of court. ***See*** Pa.O.C.R. 8.1. The Rules permit a party to file a motion for reconsideration of a final order. ***See*** Pa.O.C.R. 8.2. The Orphans' Court may consider a motion for reconsideration only if the motion is filed within thirty days of the entry of the disputed order; the mere filing of a motion for reconsideration, however, is insufficient to toll the appeal period. ***See PNC Bank, N.A. v. Unknown Heirs***, 929 A.2d 219 (Pa.Super. 2007); 42 Pa.C.S.A. § 5505.

Initially, we note "[o]ur standard of review of the findings of an orphans' court is deferential." *In re Ware*, 814 A.2d 725, 731 (Pa.Super. 2002) (citation omitted). "When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence." *In re Estate of Rosser*, 821 A.2d 615, 618 (Pa.Super. 2003) (citation omitted). "Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion." *Ware*, 814 A.2d at 731. "The test to be applied is not whether we, the reviewing court, would have reached the same result, but whether a judicial mind, after considering the evidence as a whole, could reasonably have reached the same conclusion." *In re Gumpher*, 840 A.2d 318, 321 (Pa.Super. 2003) (citations omitted).

In her first issue, Jan contends the Orphans' Court erred in failing to award the funds in question to her since the funds were her property and not the property of decedent. In this vein, Jan suggests "[i]t is clear that the funds in question were the property of [Jan], and Decedent could not unilaterally terminate the interest of [Jan] or gift the funds to [the Children]." Jan's Brief at 22-23.

We find this issue to be waived. Jan's two page "argument" pertaining to this issue contains no relevant authority and minimal analysis. *See* Jan's Brief at 21-23. "The Rules of Appellate Procedure state unequivocally that

each question an appellant raises is to be supported by discussion and analysis of pertinent authority." *Eichman v. McKeon*, 824 A.2d 305, 319 (Pa.Super. 2003) (citations omitted). *See* Pa.R.A.P. 2119 (setting forth requirements for the argument portion of appellate briefs).

Here, Jan summarily posits that "she believes that the Prenuptial Agreement is superior to the Property Settlement Agreement." Jan's Brief at 22. Also, as the Children note in their appellate brief, Jan baldly contends, without citation to any authority, that she has an "ownership interest in these funds." Jan's Brief at 22; The Children's Brief at 20. Thus, in light of Jan's failure to develop the issue properly, we decline to address the issue further.[2] *See Branch Banking and Trust v. Gesiorski*, 904 A.2d 939 (Pa.Super. 2006) (holding failure to develop issue in appellate brief in any meaningful fashion results in waiver of the issue).

In her next issue, Jan contends the Orphans' Court erred in concluding she was personally responsible for the expenses related to the decedent's final illness. In this vein, she contends the Orphans' Court erred in relying upon the Doctrine of Necessaries as codified in 23 Pa.C.S.A. § 4102, as well as *Swidzinski v. Schultz*, 493 A.2d 93 (Pa.Super. 1985). Specifically, Jan contends the Orphans' Court's reliance upon these authorities was improper

---

[2] In any event, as discussed *infra*, we conclude the Orphans' Court thoroughly examined the PSA, the prenuptial agreement, the Will, and the Power of Attorney, as well as the applicable portion of the statute related to a Power of Attorney, 20 Pa.C.S.A. § 5601.4.

since the decedent "had sufficient assets to pay for his care" and "[n]o suit was ever instituted against the Decedent or his Estate for payment by the Decedent's medical provider." Jan's Brief at 24.

In **Swidzinski**, **supra**, this Court held that where a deceased spouse's estate is insufficient to pay for the spouse's funeral expenses, the surviving spouse shall be charged with the insufficiency as it is the spouse's burden arising out of the marital relationship.

Further, 23 Pa.C.S.A. § 4102 provides:

**§ 4102. Proceedings in case of debts contracted for necessaries**

In all cases where debts are contracted for necessaries by either spouse for the support and maintenance of the family, it shall be lawful for the creditor in this case to institute suit against the husband and wife for the price of such necessaries and, after obtaining a judgment, have an execution against the spouse contracting the debt alone; and, if no property of that spouse is found, execution may be levied upon and satisfied out of the separate property of the other spouse.

23 Pa.C.S.A. § 4102 (bold in original).

In the case *sub judice*, the Orphans' Court relevantly reasoned as follows:

[Jan] testified that the $210,482.00 in retirement funds that were to go to the [C]hildren "were not paid to them because all had been dispersed." However, an agent, as a fiduciary of the principal, must exercise her powers for the benefit of the principal. 20 Pa.C.S.A. § 5601(e)(1). That did not occur in this case.

This Estate is essentially insolvent, as was Scott at the end of his life. As a result, Jan paid the funeral costs, the inheritance taxes, and a number of other administrative costs out of her pocket. For this, she seeks reimbursement.

\*\*\*

- 14 -

[Jan] is the Executrix as well as the residuary legatee. Although the residuary legatee, she gets paid last, after creditors.

Jan…testified at trial that she understood she was to pay for Scott's care and funeral. She agreed that she had some assets of her own that could be used to pay for his expenses such as her house and, in fact, she paid for the funeral ($20,000) and other expenses such as the attorney's bills because there was no money in the Estate. She is correct—these were her personal obligations. She cannot get them back from the Estate.

In *Swidzinski*, [*supra*,] the [appellate] court explained the common law [D]octrine of [N]ecessaries and held that "where a deceased husband's estate is insufficient to pay his funeral expenses, those expenses, to the extent of the insufficiency, shall be charged to his surviving wife, as her share in the burdens arising out of the marital relationship."

The same must be true of the expenses of the final illness, and the necessaries of the deceased spouse. In Pennsylvania, a contract creditor may institute suit against a husband and wife for the price of necessaries and, after obtaining a judgment, have an execution against the contracting spouse alone. If no property of the contracting spouse is found, execution may be levied on, and satisfied out, of the separate property of the other spouse. 23 Pa.C.S.A. § 4102.

Finally, the evidence at trial revealed several questionable estate expenses paid by [Jan]. These included expenses for the installation of flood lights at her home, the addition of a toilet, and post-mortem expenses for aides including "grief therapy." These items are improper estate expenditures and the sums paid have to be returned to the Estate by [Jan].

Orphans' Court Opinion, filed 6/8/20, at 15-19.

Initially, we note the Orphans' Court's factual findings, particularly as it relates to the fact the decedent and his estate were insolvent, and Jan had personal assets of her own, are supported by the record. Thus, we are bound by these findings. *See In re Estate of Rosser*, *supra*.

- 15 -

Further, to the extent the Orphans' Court utilized the common law Doctrine of Necessaries, as codified in Section 4102, and **Swidzinski**, **supra**, in determining that Jan was not entitled to take non-estate assets, such as the subject IRA, to pay for the decedent's funeral expenses, as well as expenses related to Scott's final illness, we find no error.

Jan contends Section 4102 is inapplicable to this matter since no creditor instituted suit against the decedent or his estate. **See** Jan's Brief at 24. However, the Orphans' Court determined that Jan improperly paid creditors, at least in part, from the IRA funds, which should have been dispersed to the Children. **See** Orphans' Court Opinion, filed 6/8/20. Accordingly, it was Jan's own improper use of the IRA that eliminated the creditors, who, in light of the insolvency of the decedent and his estate, could have sought payment from her. **See** 23 Pa.C.S.A. § 4102. In any event, the Orphans' Court cited to **Swidzinski** and Section 4102 for the general proposition that, when an estate is insolvent, as in this case, the funeral and final illness expenses are obligations of the surviving spouse. We find no error of law in this regard. **In re Estate of Rosser**, **supra** (holding we must determine if the record is free from legal error).

In her next issue, Jan contends the Orphans' Court erred in holding that Jan did not have the authority to change the beneficiary designation of the decedent's retirement funds from the Children to her. In this regard, she contends the Orphans' Court erred in its application of 20 Pa.C.S.A. § 5601.4

in that she demonstrated her exercise of authority under the Power of Attorney was "not otherwise prohibited by another agreement or instrument to which the authority or property is subject."[3]  Jan's Brief at 27.

Here, the Orphans' Court relevantly indicated the following:

> [20 Pa.C.S.A. §] 5603(q) of the [Power of Attorney] Act…reads:
>
>> (q) <u>Power to Engage in Retirement Plan Transactions</u>—A power to "engage in retirement plan transactions" shall mean that the agent may contribute to, withdraw from and deposit funds in any type of retirement plan (including, but not limited to, any tax qualified or non-qualified pension, profit sharing, stock bonus, employee savings and retirement plan, deferred compensation plan or individual retirement account), select and change payment options for the principal, make roll-over contributions from any retirement plan to other retirement plans and, in general, exercise all powers with respect to retirement plans that the principal could, if present, *provided, however, that the agent shall have no power to create or change a beneficiary designation unless authorized in accordance with § 5601.4.*
>
> (emphasis added).
>
> Section 5601.4 provides:
>
> § 5601.4. Authority that Requires Specific and General Grant of Authority
>
> **(a) General rule.--**An agent under a power of attorney may do the following on behalf of the principal or with the principal's property *only if the power of attorney expressly grants the agent the authority and exercise of the authority is not otherwise prohibited by another agreement or*

---

[3] Aside from quoting a portion of 20 Pa.C.S.A. § 5601.4, Jan has presented no pertinent authority in support of this issue.  ***See*** Jan's Brief at 27-29.

*instrument to which the authority or property is subject*:. . .

(4) Create or change a beneficiary designation.

[20 Pa.C.S.A. § 5601.4(a)(4)] (emphasis added).

Consequently, to determine whether in this case the change of beneficiaries on Scott's retirement account was [proper], we must inquire whether the exercise of the authority is "not otherwise prohibited by another agreement or instrument to which the authority or property is subject."

Scott and Jan certainly were aware that there was an order of court founded upon his written promise obligating Scott to pay child support and college tuition for his children. This is equivalent to "another agreement or instrument…to which the…property is subject." They had no doubt that this obligation was linked to his employment retirement benefits then at DeLage Landen Financial Services. The connection between the retirement benefits and that obligation was also manifested at the end of the Will. Paragraph 12, as mentioned, states "my children, ALEXANDRA LASSER, WILLIAM LASSER, AND GWENDOLEN LASSER are intentionally not named as primary beneficiaries under my Will not for lack of love for them but because I have specifically provided for my children via a certain beneficiary directed account." (Exhibit P-4). And as of the date of the Will, he had indeed done so.

Scott and Jan both recognized this obligation, which was the subject of a contract and court order, throughout their marriage. They even effected some additional tuition payments just before Scott's passing. Jan cannot now be heard to say that she could use the power of attorney to place herself as the beneficiary, as it would be prohibited by extant agreements or instruments to which the property was subject, as she very well knew.

It is true that Scott stated it to be his "desire" to designate Jan as the beneficiary of his retirement benefits. He did not direct that to occur nor did he make any effort himself, while he could, to make such a change. The word "desire" is understood ordinarily as a precatory word—a "wish" instead of a "mandate." Our courts have said:

> When precatory words are used merely for the purpose of advising or influencing or expressive of a wish or desire that the legatee make a certain use of the testator's bounty, they are not obligatory upon that to whom they are addressed; but when used to

express his manifest intention to control or direct, they are mandatory, and will be so construed in saying what effect is to be given to them…

*In re: Estate of Mumma*, 125 A.3d 1205, 1213 (Pa.Super. 2015) [(citation omitted)].

"The test is whether the precatory expression was used in a mandatory sense, though couched in a mild, polite, courteous command, or only as a suggestion or wish, falling short of binding of compulsory direction." *In re: Estate of Pearson*, 442 Pa. 172, 275 A.2d 336, 339 (1971). In *Mumma*, the [Superior] Court agreed with the Orphans' Court's determination that the decedent's expressed "desire," that businesses remain in the family, was mere precatory language—a wish instead of a mandate. The context is different here, but the result is the same. The desire was based on a hope that never materialized, that is that Scott would have sufficient finances to leave Jan something at the time of his passing. There was testimony that Scott did not believe he would live as long as he did.

By comparison, Scott used the word "shall" when dealing with the subject of college education. The 2001 PSA states:

13. College Funds. The parties have agreed that Husband *shall* pay for tuition and expenses.

(Exhibit P-1) (emphasis added).

Jan has no comparable agreement or instrument concerning the subject property. Her exercise of the power of attorney to change the beneficiary designation to her was invalid and is of no force in effect.

Orphans' Court Opinion, filed 6/8/20, at 12-15 (emphasis in original).

We conclude the Orphans' Court's factual findings are supported by the record and there is no error of law. *See In re Estate of Rosser*, *supra*. Contrary to Jan's contention, the Orphans' Court properly interpreted the property settlement agreement between Cassandra and Scott as expressly providing that Scott would pay for the Children's college tuition and, to this end, Scott named the Children as beneficiaries of the IRA. Thus, as the

J-A13031-21

Orphans' Court held, 20 Pa.C.S.A. § 5601.4 precluded Jan, as power of attorney, from changing the beneficiary designation of the IRA since exercise of such authority is prohibited by another agreement to which the property is subject (the property settlement agreement).

In her final issue, Jan contends the Orphans' Court erred in failing to evaluate all of the individual expenses incurred by Jan, as opposed to summarily rejecting them, in determining that Jan's use of the IRA proceeds was improper. She contends she is entitled to "reimbursement" for some of the expenses.

Jan premises her argument that she is entitled to "reimbursement" upon the following:

> The Court below relied upon the Doctrine of Necessaries as the basis for its decision. As mentioned above, the Doctrine of Necessaries is inapplicable in the instant action.
>
> ***
>
> Instead of granting [Jan] reimbursement for the reasonable expenses paid for care, materials and modification to her residence, the Court below required [Jan] to pay all of the expenses for Decedent, relying upon the Doctrine of Necessaries.

Jan's Brief at 30.

As indicated *supra*, we find no merit to Jan's contention that the Orphans' Court improperly relied upon the Doctrine of Necessaries. Jan attempts to re-hash this argument, and thus, we decline to address it further.

For all of the forgoing reasons, we affirm.

Affirmed.

- 20 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/8/21